767 A.2d 321

**Shahriar GOHARI et al.,**

v.

**John R. DARVISH.**

**No. 25, Sept. Term, 2000.**

Court of Appeals of Maryland.

Feb. 23, 2001.

44

Paul M. Smith (Elizabeth A. Cavanagh of Jenner & Block, on brief), Washington, D.C., for petitioners.

David G. Leitch (Catherine E. Stetson of Hogan & Hartson, L.L.P., on brief), Washington, D.C., for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

HARRELL, J.

John R. Darvish, Respondent, was found liable by a jury in the Circuit Court for Montgomery County of defamation of Shahriar Gohari, Petitioner, and of tortious interference with a contract that Gohari had entered to purchase an automobile dealership. The jury awarded Petitioner compensatory damages in the amount of $500,000.00 for the defamation claim. Petitioner and Arlington Motors, Inc., Petitioner's co-plaintiff at trial, also were awarded $2,120,000.00 for tortious interference with the contract. The Court of Special Appeals vacated the judgment and remanded the case to the Circuit Court. According to the Court of Special Appeals, Respondent was entitled to a new trial, presumably on both counts, at which time he would be permitted to assert a qualified privilege defense and to introduce evidence that his statements about Petitioner were true. *Darvish v. Gohari*, 130 Md.App. 265, 745 A.2d 1134 (2000). We granted Petitioner's petition for writ of certiorari, *Gohari v. Darvish*, 359 Md. 28, 753 A.2d 1 (2000), to consider the following questions:

1. Whether the law of qualified privilege should be expanded to protect a business owner's defamatory statements about a former employee who seeks to enter a competitive business arrangement with a third party, even though such statements neither arise in the context of an employer-

employee relationship nor relate to any common interest of the business owner and third party.

2. Whether a jury verdict may be reversed where a qualified privilege defense instruction, if given, would not have made any difference to the verdict, yet the Court of Special Appeals failed to consider whether any error is harmless.

## I.

### A. *Factual Background*

Darvish, at all pertinent times, was the owner and chief executive officer of Darcars Automotive Group (Darcars), the umbrella organization of a group of automotive franchises and related enterprises. In January 1987, Darvish hired Gohari, an accountant by training,[1] as a comptroller trainee at one of the Darcars dealerships. In January 1988, Darvish promoted Gohari to comptroller of Darcars Toyota, where he was responsible for overseeing the accounting and financial functions of the dealership. By 1992, Gohari ascended to the position of senior vice president of the Darcars Automotive Group[2] and was identified as such on the Darcars Toyota dealer's license.

Although Gohari accumulated extensive experience in the financial and accounting aspects of the businesses operated under the Darcars umbrella while working there, he was not trained in other aspects of its operations. Darvish testified that the only training Gohari received was in accounting; Gohari was not provided with any training in sales, service, or any of the other operating departments in the Darcars empire.[3] Because he specialized in the financial side of the

---

1. At trial, Gohari testified that he was a chartered accountant, the European equivalent to a CPA.

2. Gohari testified at trial that Darvish also named him vice president at several other Darcars dealerships, vice president of the entity that sells life insurance products at the dealerships, trustee of the Darcars employees' 401K plan, and senior vice president of Mariam, Inc., the company that owns and operates all of the Darcars dealerships.

3. Darvish explained that Gohari did have an automobile salesman's license, but only to satisfy a requirement of the State of Maryland,

business, with demanding responsibilities that Darvish described as "more than a full time job," Gohari did not supervise directly the sales, service, or parts department of Darcars Toyota, nor did he, according to Darvish, ever express an interest in training to become a general manager in charge of supervising those departments.[4] At trial, Gohari agreed that he had not expressed interest in becoming a general manager because such a position would be the equivalent of a demotion from his position as senior vice president. When asked whether he lacked retail operational experience in the business, however, Gohari asserted that he did not lack such experience.[5]

In August of 1996, Gohari quit his job with Darcars. In November of 1996, he entered into an agreement with James Kline to buy the Kline Arlington Toyota dealership.[6] Needing Toyota's permission to consummate the transaction, Gohari applied to Toyota Motor Sales, Inc.'s (Toyota) local agent, Central Atlantic Toyota Distributors, Inc. (CATD), for approval to own and operate the dealership. According to testimony at trial, CATD was responsible for examining "the credentials

Department of Motor Vehicles, that anyone who drives a company car on a dealer tag must have a salesman's license.

**4.** Darvish testified that Gohari had shown no interest in becoming a general manager and that Gohari did not have enough sales experience to be a general manager.

**5.** With regard to Gohari's asserted lack of formal training or significant experience in sales, in contrast, Tamara Darvish, the general manager of Darcars Toyota and the person to whom the sales, service, and parts departments ultimately reported, had been selling cars since 1984, after receiving a college degree in automotive marketing and additional extensive training in automotive sales and service. Gohari testified, however, that he observed salespeople working on the dealership floor to ascertain whether they followed the proper procedures in their dealings with customers, that he was on the sales floor thirty to forty times a day, that he sold cars himself, and that he had been a licensed car salesperson in Maryland since 1987.

**6.** Arlington Motors, Inc. was the corporate entity formed by Gohari to acquire the assets of Kline Arlington Toyota.

of the individual to determine whether or not [he or she] qualified to be a dealer and/or operator."

On 2 December 1996, Gohari met with Dennis Clements, president, and Roy Arminger, dealer development manager, of CATD. Gohari authorized CATD to "inquire, through outside sources, about [his] character, general reputation and credit history" and to "obtain and share information from and with any of its affiliated entities." At trial, Clements testified that he specifically sought and received Gohari's permission to interview Darvish about Gohari's work experience at Darcars Toyota. On 10 December 1996, Clements met with Darvish and inquired about Gohari's qualifications—experience, background, and capabilities—to own the Arlington Toyota franchise. Later that day, Clements also met with Kline to report on the status of CATD's consideration of Gohari's franchise transfer application.

Clements drafted a file memorandum, dated 10 December 1996, regarding his meeting with Kline. In that memorandum, Clements related some of what he claimed Darvish told him in their meeting on 10 December 1996. That memorandum recited that Darvish told Clements that "Gohari lacked the experience, capacity and character to be considered a qualified candidate." Clements drafted a second file memorandum, dated 11 December 1996, purportedly memorializing his 10 December 1996 meeting with Darvish, which stated that Darvish also told Clements that Gohari "had suddenly left the DARCARS organization several months ago in an unprofessional manner and with no notice[,] . . . that there was questionable financial manipulation by Mr. Gohari to inflate his compensation[,] and that Mr. Darvish should have terminated Mr. Gohari's employment much earlier but had kept him on out of loyalty." The 11 December 1996 memorandum also stated, among other things, that Gohari "had no experience in the operational aspects of a dealership" and that Darvish strongly questioned whether Gohari's experience or background qualified him to operate a dealership.

Clements spoke to Armiger about his meeting with Darvish, and Armiger prepared his own file memorandum summarizing Clements's description of Darvish's 10 December comments about Gohari. During a 12 December 1996 telephone conversation with Darvish, Arminger read aloud to Darvish several passages from this memorandum reciting what Darvish reportedly told Clements about whether Gohari "had had operational authority over the dealership, dishonesty, manipulation of financial figures, people skills and whether ... he had had other automotive experience other than accounting." Arminger testified that, after relating these passages to Darvish, Darvish remained silent, offering no denials as to whether he had made these statements. Arminger considered the silence to be confirmation that Darvish had made the statements. Armiger requested that Darvish provide a letter confirming the statements that Darvish made to Clements. He told Darvish that Gohari's approval "would be dependent upon what was contained in the letter." Darvish sent Armiger the requested letter on 13 December 1996. The letter stated in part:

Mr. Gohari was employed at DARCARS ... through August 12, 1996, as in house controller.... He had responsibility for overseeing day-to-day accounting issues and coordinating all accounting issues with ... DARCARS' outside accounting firm.

Mr. Gohari's responsibilities did not include, however, involvement in or supervision over other dealership departments, including New and Used Car Sales, Service and Parts, Leasing, Body Shop, Customer Relations, or Finance or Insurance Programs....

Unfortunately, Mr. Gohari left his employment in a most unprofessional manner.... As a result, there are many unanswered questions concerning the proper allocation of expenses in the dealership and pay plan applications.

CATD ultimately concluded that, because Gohari lacked the necessary operational experience, it would require that he recruit a qualified general manager to oversee the day-to-day retail business of the dealership before it would approve the

franchise transfer. Gohari submitted several names as possible general managers, but was unable to procure CATD approval before his contract with Kline expired by its terms.

## B. Procedural History

Gohari, in his amended complaint in the Circuit Court, alleged that Darvish had defamed him and had tortiously interfered with his contract to purchase the Kline Arlington Toyota dealership. In his answer, Darvish asserted that his communications to CATD, solicited with Gohari's permission as part of CATD's evaluation of his dealership application, were privileged. Before trial, Gohari filed a motion in limine to preclude Darvish from asserting qualified privilege. The Circuit Court granted this motion, without further elaboration as to its reasoning.[7]

Gohari also filed motions in limine to preclude Darvish from introducing at trial evidence of Gohari's dishonesty or manipulation of financial statements while at Darcars, claiming that Darvish had waived any defense of truth by denying that he had said Gohari was dishonest or manipulated financial statements.[8] Darvish opposed the motions, arguing that Gohari was required to prove that Darvish's alleged statements were false and that Darvish was entitled to introduce evidence to the contrary. The trial court granted Gohari's motions, again without further comment.

---

7. The Circuit Court, at trial, also declined to give a requested jury instruction on the qualified privilege relative to any of the asserted defamatory statements made by Darvish.

8. According to Gohari's motions in limine, Darvish denied that he had stated that Gohari was dishonest or manipulated financial statements. At trial, Darvish testified that, regarding Gohari's character, he had no problem with Gohari "characterwise ... except the fact that when he left he left without any notice which I thought was unprofessional." Darvish also testified that he did not relate to Clements that Gohari "had manipulated financial statement figures to inflate his personal compensation." Additionally, in response to an interrogatory asking Darvish if he contended that Gohari manipulated financial statements for personal gain, to state the facts upon which he relied, Darvish stated "Defendant [Darvish] has never stated to any person that Gohari manipulated financial statements for personal gain."

After a six day trial, the jury found that Darvish made false and defamatory statements and deliberately interfered with Gohari's contract with Kline. The jury awarded Gohari $500,000.00 in compensatory damages for defamation and Gohari and Arlington Motors, Inc. $2,120,000.00 in compensatory damages for tortious interference with the contract. The jury declined to award punitive damages.

On appeal, the Court of Special Appeals reversed. *Darvish,* 130 Md.App. at 267, 745 A.2d at 1139–40. The intermediate appellate court determined that Darvish "was entitled to assert the qualified privilege defense, and to present evidence that the statements attributed to him[9] were true" so as to demonstrate that Gohari was not defamed. *Darvish,* 130 Md.App. at 274, 745 A.2d at 1138. In so finding, the court concluded that Darvish's statements to the CATD representatives, though not covered by Maryland Code (1974, 1998 Repl.Vol.), § 5–423 of the Courts & Judicial Proceedings Article,[10] came within the common law protection of qualified privileges. *Darvish,* 130 Md.App. at 275, 745 A.2d at 1139. The court determined, as required by the common law of qualified privilege, that Gohari's fitness to operate a Toyota franchise was of sufficiently important interest to CATD to give rise to a qualified privilege and that the publication was made "within the generally accepted standards of decent conduct." *Id* . (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 595(1)). In reaching this conclusion, the appellate court considered that Darvish had made the comments "in response to an [authorized] inquiry

9. *See supra* page 5 (regarding Darvish's conversations with Clements and Arminger).

10. Maryland Code (1974, 1998 Repl.Vol.), § 5–423 of the Courts & Judicial Proceedings Article provides in pertinent part:

(a) *Liability of employer.*—An employer acting in good faith may not be held liable for disclosing any information about the job performance or the reason for termination of employment of an employee or former employee of the employer:

(1) To a prospective employer of the employee or former employee at the request of the prospective employer, the employee, or former employee. . . .

and [were] not volunteered," and thus the court was "persuaded that he enjoyed 'greater latitude about what he may say about [Gohari] without incurring liability.'" *Id.* (internal quotation marks omitted) (first alteration in original) (quoting *Happy 40, Inc. v. Miller*, 63 Md.App. 24, 35, 491 A.2d 1210, *cert. denied*, 304 Md. 299, 498 A.2d 1185 (1985)). The court also took into account the business relationship between CATD and its existing franchisee, Darvish, and concluded that "[b]ased on 1) [Gohari's] express consent authorizing CATD to solicit information from [Darvish] and 2) the business relationship between CATD-franchisor, and [Darvish]-franchisee, we hold the circuit court erred in concluding that [Darvish] was not entitled to a qualified privilege." *Darvish*, 130 Md.App. at 276, 745 A.2d at 1139–40.

The Court of Special Appeals further held that Darvish's "denial that he made defamatory statements does not prevent him from asserting that those statements are substantially correct." *Darvish*, 130 Md.App. at 280, 745 A.2d at 1142. The court stated that Maryland Rule 2–303(c) [11] "expressly authorizes a party to plead alternative defenses," and "[i]t follows that [Darvish] should be able to put on evidence in support of each defense that he asserted." *Id.* (citing *Alpar v. Weyerhaeuser Co.*, 20 N.C.App. 340, 201 S.E.2d 503, 506, *cert. denied*, 285 N.C. 85, 203 S.E.2d 57 (1974)). The court concluded that Darvish was "entitled to a new trial on the qualified privilege issue" and that Darvish was "permitted the opportunity to prove that the statements attributed to him were true."

---

**11.** Maryland Rule 2–303(c), regarding consistency in the form of pleadings, states:

> (c) **Consistency.** A party may set forth two or more statements of a claim or defense alternatively or hypothetically. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has, regardless of consistency and whether based on legal or equitable grounds.

Md. Rule 2–303(c) (2000).

*Darvish,* 130 Md.App. at 281, 745 A.2d at 1142.[12]

## II.

The Circuit Court determined that the following statements Darvish allegedly made to CATD's representatives were at the heart of the litigation:

THE COURT: "Gohari never had operational authority over the dealership even at the time of Darvish's illness." Are you claiming that to be defamatory?

[GOHARI'S TRIAL COUNSEL]: Yes sir.

THE COURT: Okay. "He manipulated financial statement figures to inflate his personal compensation."

[GOHARI'S TRIAL COUNSEL]: Yes, sir.

THE COURT: "He was dishonest."

---

**12.** The Court of Special Appeals also addressed Darvish's question whether Arminger's statements were inadmissable hearsay. *Darvish v. Gohari,* 130 Md.App. 265, 277, 745 A.2d 1134, 1140 (2000). The court determined that the statements were not inadmissable hearsay as Maryland "has long recognized so called 'tacit admissions' by a party-opponent in both civil and criminal actions as an exception to the hearsay rule under common law. . . . This common law was codified as Maryland Rule 5–803(a)(2) which took effect on" 1 July 1994. *Id.* (alteration in original) (quoting *Key–El v. State,* 349 Md. 811, 816, 709 A.2d 1305 (1986)). The court concluded:

> The jurors were entitled to conclude that a reasonable person would have denied making statements and thereby assign the "weight" they believed [Darvish's] silence "to be worth." *Key–El,* 349 Md. at 819, 709 A.2d 1305. The circuit court's decision allowing Arminger to testify about the statements at issue was not erroneous. [Darvish] was entitled to a jury instruction that his silence could not be used against him unless the jurors were persuaded that (1) he heard and understood what Arminger said to him, and (2) if the statements attributed to him by Clements were incorrect, he would have corrected the errors. [Darvish] was not, however, entitled to the exclusion of that testimony.

*Darvish,* 130 Md.App. at 279, 745 A.2d at 1141. As Darvish did not file a cross-petition for certiorari regarding this issue, we shall not comment further on this aspect of the Court of Special Appeals's opinion. *See* Md. Rule 8–131(b)(1) (2000) (stating that on appeal, "the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals").

**54**

[APPELLEE'S TRIAL COUNSEL]: Yes sir

\* \* \*

THE COURT: All right. "People don't like him."

[GOHARI'S TRIAL COUNSEL]: Yes, I think that is because I think that does really go to the heart of being the operator of a dealership. I think it is borderline, ... it is not something that I am going to spend a lot of time on. . . .

 Petitioner contends that no qualified privilege protects a business owner's defamatory statements about a former employee who seeks to enter a directly competitive business arrangement with a third party, in this case a potential common franchisor. Respondent argues that the Court of Special Appeals "correctly held that the common law affords a qualified privilege to a franchisee who gives information about a former employee to his franchisor at the franchisor's request, just as it protects communications in other business and employment-related contexts." We agree with Respondent and the Court of Special Appeals.

 Under Maryland law, to present a prima facie case for defamation,

> a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm.

*Rosenberg v. Helinski,* 328 Md. 664, 675, 616 A.2d 866, 871 (1992) (citing *Hearst Corp. v. Hughes,* 297 Md. 112, 120–25, 466 A.2d 486 (1983); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976)). A defamatory statement is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Id.* (citing *Batson v. Shiflett,* 325 Md. 684, 722–23, 602 A.2d 1191 (1992)).

■ A defendant, in a defamation suit, may assert a qualified, or conditional, privilege.[13] *See generally* DAN B. DOBBS, THE LAW OF TORTS, §§ 413–414 (2000) [hereinafter THE LAW OF TORTS].[14] As the Court of Special Appeals succinctly stated, "[t]here are circumstances in which a person will not be held liable for a defamatory statement because the person is acting 'in furtherance of some interest of social importance, which is entitled protection.'" *Woodruff v. Trepel,* 125 Md.App. 381, 391, 725 A.2d 612, 617 (1999), *cert. denied,* 354 Md. 332, 731 A.2d 440 (1999) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 114, 815 (5th ed.1984) [hereinafter PROSSER & KEETON] ); *see also Miner v. Novotny,* 304 Md. 164, 167, 498 A.2d 269, 270 (1985) ("For reasons of public policy, the law of defamation recognizes certain communications as privileged, and thereby affords those who publish such communications immunity from liability.").

In *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978), we explained:

The common law conditional privileges rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the

---

**13.** A defendant also may assert applicable absolute privileges. An absolute privilege is one which provides complete immunity and applies,

subject to limitations, principally to (1) judicial proceedings: (2) legislative proceedings; (3) in some cases to executive publications; (4) publications consented to, (5) publications between spouses; (6) publications required by law.

DAN B. DOBBS, THE LAW OF TORTS, §§ 413–414 (2000) [hereinafter THE LAW OF TORTS]. We explained that the difference between an absolute privilege and a qualified privilege is that "the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused." *Di Blasio v. Kolodner,* 233 Md. 512, 522, 197 A.2d 245, 250 (1964) (citing *Carr v. Watkins,* 227 Md. 578, 177 A.2d 841 (1962)).

**14.** This treatise is the direct lineal descendant of W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS (5th ed.1984). *See* THE LAW OF TORTS, *supra* note 13, at V.

vindication of a plaintiff's reputational interest.... Specifically, the common law recognized that a person ought to be shielded against civil liability for defamation where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general.

*Marchesi,* 283 Md. at 135–36, 387 A.2d at 1131 (internal citations omitted); *see McDermott v. Hughley,* 317 Md. 12, 28, 561 A.2d 1038, 1046 (1989) ("A statement is accorded a qualified privilege 'only when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto.'" (quoting *Simon v. Robinson,* 221 Md. 200, 206, 154 A.2d 911 (1959))).

Communications arising out of the employer-employee relationship "clearly enjoy a qualified privilege." *McDermott,* 317 Md. at 28, 561 A.2d at 1046 (citing *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976)); *see also* Maryland Code (1974, 1998 Repl.Vol.), § 5–423 of the Courts & Judicial Proceedings Article (provided *supra* note 10). A qualified privilege in Maryland for the employer-employee relationship is found in (1) Maryland Code (1974, 1998 Repl. Vol.), § 5–423 of the Courts & Judicial Proceedings Article, *supra* note 10, and (2) the common law. The Court of Special Appeals correctly determined that the franchisor-franchisee relationship in the present case is not covered by § 5–423. The intermediate appellate court reasoned that "[b]ecause CATD is a prospective franchisor and not a prospective employer [as to Gohari], [Darvish's] statements do not fall within the letter of this statutory protection. This statute, however, did not abrogate the common law, and [Darvish] asserts that the circuit court should have found that his statements were protected by the common law. We agree." *Darvish,* 130 Md.App. at 275, 745 A.2d at 1139.

The Court of Special Appeals also was correct in concluding that the common law qualified privilege applied in the present case. The common law conditional privilege is

broad and may apply to "an infinite variety of factual circumstances." *Hanrahan v. Kelly*, 269 Md. 21, 28, 305 A.2d 151, 156 (1973); *see also McDermott*, 317 Md. at 28–29, 561 A.2d at 1046–47 (providing numerous examples in which we have determined the application of a qualified privilege to be appropriate). Though we have not recognized before a qualified privilege applicable to communications in a franchisor/franchisee relationship, we determine, taking into consideration the breadth of the privilege, that it is available as a defense in such circumstances.

■ According to one scholar, there are four basic common law qualified privileges:

(1) The public interest privilege, to publish materials to public officials on matters within their public responsibility; (2) the privilege to publish to someone who shares a common interest, or, relatedly, to publish in defense of oneself or in the interest of others; (3) the fair comment privilege; and (4) the privilege to make a fair and accurate report of public proceedings.

THE LAW OF TORTS, *supra*, § 413, at 1158 (footnote omitted); *see also Hanrahan*, 269 Md. at 29, 305 A.2d at 156 ("Mutual interest in the subject matter is but one type of qualified privilege recognized in the law of defamation." (citing *Stevenson v. Baltimore Club*, 250 Md. 482, 486, 243 A.2d 533, 536 (1968))); RESTATEMENT (SECOND) OF TORTS §§ 593–597.

■ The conditional privilege at issue in the present case involves Professor Dobbs's subsection, *supra*, (2)—"the privilege to publish to someone who shares a common interest, or, relatedly, to publish in defense of oneself or in the interest of others." The standard for common interest is the following:

An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.

*Hanrahan*, 269 Md. at 28, 305 A.2d at 156; *see* RESTATEMENT (SECOND) OF TORTS § 596. In determining what qualifies as a

common interest, we have stated that a common interest may include "interests in property, business and professional dealings," *id.,* and can "inhere in business dealings between the publisher and the recipient." *Hanrahan,* 269 Md. at 28 n. 2, 305 A.2d at 156 n. 2 (citing *Deckelman v. Lake,* 149 Md. 533, 131 A. 762 (1926); *Bavington v. Robinson,* 124 Md. 85, 91 A. 777 (1914)). Dobbs has elaborated:

> Common interests are usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor. . . . The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit. . . . The privilege does not arise in the first place unless the communication relates in some degree to the common interest, and once the privilege arises it is lost if it is abused by malice or excessive publication.

THE LAW OF TORTS, *supra,* § 414, at 1160–61.

The record in the present case demonstrates a common interest shared by CATD/franchisor and Darvish/franchisee for they share in "business and professional dealings." *See Hanrahan,* 269 Md. at 28, 305 A.2d at 156. It was undoubtedly in CATD's business interest to receive an accurate, full, and truthful assessment of the qualifications of a proposed franchisee candidate to operate one of its franchises. A logical person to give such an assessment might be someone like Darvish—Gohari's former employer and an existing franchisee of Toyota, CATD's principal. Furthermore, conceptually it would be in Darvish's professional interest to answer candidly as Darvish must deal with CATD and Toyota on an ongoing basis as a Toyota franchisee. For example, Darvish "reports his sales to CATD and requests inventory from CATD, and it is CATD which, as in this case, holds approval power over the potential sale or transfer of a Toyota franchise." Thus, there is a common interest in maintaining a candid business relationship in furtherance of the franchisee's individual success and the overall success of the franchisor.

We perceive also that a need "to publish . . . in the interest of others" arguably is present in this case. The rule regarding the protection of interest of the recipient or a third person has been explained as follows:

(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of the recipient or a third person, and

(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.

(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

(a) the publication is made in response to a request rather than volunteered by the publisher *or*

(b) a family or other relationship exists between the parties.

RESTATEMENT (SECOND) OF TORTS § 595, at 268 (emphasis added); *see also Darvish,* 130 Md.App. at 275, 745 A.2d at 1139–40.

It seems patent that information regarding Gohari's qualifications would be important to CATD and Toyota. The information supplied by Darvish also appears to have been supplied within generally accepted standards of decent conduct. The comment regarding subsection (1) of the Restatement states that "a statement made for the protection of a lawful business, professional, property or other pecuniary interest . . . comes within the rule stated in this Section." RESTATEMENT (SECOND) OF TORTS § 595, at 270. Additionally, the comment states that "[i]t is enough that the circumstances are such as to lead to the reasonable belief that the third person's interest is in danger." *Id.* The statements made by Darvish regarding Gohari's abilities to operate a Toyota franchise fall here.

When considering whether Darvish acted within generally accepted standards of decent conduct, it is important to look at the circumstances of the present case [15] and "[t]he social value of the particular interest of the third person that is believed to be imperiled, the value of the communication as a means of protection if the defamatory matter is true, the probable harm to the person defamed if the defamatory matter is false, and the fact that the publication is made in response to a request." *Id.* The fact that the communication is made in response to a request is of particular importance:

> The fact that the recipient has made the request is an indication that he, at least, regards the matter in respect to which information is desired as sufficiently important to justify the publication of any defamatory matter than may be involved in response to the request. In that case, the person requested to give information is not required nicely to evaluate the interest that the person making the request seeks to protect, nor to make that comparison otherwise required of him, between the harm likely to be done to the other's reputation if the defamatory matter is false and the harm likely to be done to the third person's interest if the it should prove true

RESTATEMENT (SECOND) OF TORTS § 595, at 273–74.

The importance of the response/request qualification to the existence of a conditional privilege has been noted previously in Maryland. In *Fresh v. Cutter*, 73 Md. 87, 92, 20 A. 774, 775 (1890), a case involving slander and a qualified privilege, we stated "[i]f ... the statement be made in response to an inquiry, it would undoubtedly be privileged." (Citations omitted). The Court of Special Appeals also has noted that "where the defamatory publication is ... in response to an inquiry and not volunteered, the defendant is afforded greater latitude in what he may say about the plaintiff without incur-

---

**15.** The *Restatement* cautions that "[t]he circumstances of each case are important in determining whether the publication to the particular recipient is within the current standards of socially desirable or at least permissible conduct." RESTATEMENT (SECOND) OF TORTS § 595, at 273.

ring liability." *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 35, 491 A.2d 1210, 1216 (1985) (citing *Stevenson v. Baltimore Baseball Club, Inc.,* 250 Md. 482, 487, 243 A.2d 533 (1968); *Fresh,* 73 Md. at 92, 20 A. 774; *Beeler v. Jackson,* 64 Md. 589, 593, 2 A. 916 (1886)).

In the present case, Darvish was approached by CATD to provide his assessment of his former employee's, Gohari's, qualifications as the prospective owner-operator of a Toyota dealership. CATD approached Darvish after receiving Gohari's express permission to do so. Moreover, Gohari's Toyota dealership application permitted CATD to obtain information from other sources about his "character, general reputation and credit history" and to "obtain and share information ... from and with any of its affiliated entities."

The only other jurisdiction to address directly the flagship question presented in this case held that a qualified privilege may be applied to communications in franchisor/franchisee relationships. In *Quinn v. Jewel Food Stores Inc.,* 276 Ill. App.3d 861, 213 Ill.Dec. 204, 658 N.E.2d 1225 (1995), the plaintiff was a former employee of Jewel Food Stores (Jewel) and, while working for Jewel, had received work evaluations in which he was described, in part, as being a con artist. *Quinn,* 213 Ill.Dec. 204, 658 N.E.2d at 1228–29. The plaintiff left Jewel and sought a franchise with Southland Corporation (7–Eleven) and White Hen Pantry convenience stores. *Quinn,* 213 Ill.Dec. 204, 658 N.E.2d at 1229. The plaintiff authorized the release of his personnel file from Jewel to the Southland Corporation and White Hen Pantry. *Id.* He was unaware of the contents of this file or that it contained the above mentioned evaluation. *Id.* The plaintiff was denied a franchise and subsequently sued Jewel for defamation. *Id.* The Appellate Court of Illinois determined that Jewel had a qualified privilege because the situation involved "some interest of the person to whom the matter is published or of some other third person ." *Quinn,* 213 Ill.Dec. 204, 658 N.E.2d at 1234. In so determining, the Illinois court stated: "[p]laintiff seeks to differentiate the relationships between franchisor-franchisee and employer-employee relationship. However, we believe

the difference between the two is in form, rather than substance." *Id.* We recognize this case as persuasive and reject Petitioner's argument that *Quinn* is distinguishable on the basis that "the plaintiff in *Quinn* specifically authorized the release of his entire employment file, including an internal evaluation form, by his former employer." Gohari authorized an equally broad, if not broader, inquiry than in *Quinn,* in light of the Toyota Dealer Application, which allowed, as stated *supra,* CATD to inquire, of "outside sources," into Gohari's "character, general reputation and credit history."

Lastly, Petitioner argues that there can be no qualified privilege because "Darvish, as Gohari's potential competitor, had a powerful interest in destroying Gohari's chances of entering into the same sort of contract with CATD and acquiring his own Toyota dealership," and thus, "[n]o 'social polic[ies]' . . . are advanced by applying a qualified privilege under such circumstances; to the contrary, a qualified privilege would only injure competition and protect individuals whose self-interest lies in defaming innocent parties." Petitioner's Br. at 17 (alteration in original) (quoting *Marchesi,* 283 Md. at 135, 387 A.2d at 1131). We agree that the potential competitive interest of Darvish should not be disregarded. This same competitive interest, however, may exist within the employer/employee relationship. The mere fact that a franchisor/franchisee relationship underlies the present case does not make Petitioner's competitive interest argument any more poignant than when an employer/employee relationship is present. Indeed, in his reply brief, Petitioner acknowledges that the same interest may be present in employment relationships, but attempts to distinguish franchise relationships by arguing that

> [t]he issue here is whether a privilege should be extended to a quite different context—heretofore unrecognized by Maryland courts and the Maryland legislature—in which the speaker, simply by virtue of his position in the marketplace, *inevitably* has incentives to disparage the subject of the communications in order to minimize competition.

Petitioner's Reply Br. at 6–7 (emphasis in original). As stated, *supra,* we do not believe that, for present purposes, the contrast between the employment and franchise relationships is as stark as Petitioner paints. Additionally, the same situation as with an existing franchisee aiming to preserve his or her position in the marketplace may arise with a former employer when a former employer enters, or attempts to enter, competition or in the same market. *See, e.g., Jacron Sales Co. v. Sindorf,* 276 Md. 580, 582–83, 598–601, 350 A.2d 688, 690, 698–700 (1976) (discussing defamation and qualified privileges in a case in which the plaintiff left his former employer on uncertain terms to work with another employer "in a similar capacity").

Whether Respondent made the statements, assuming them to be false for present analysis, because of his competitive interest becomes part of the evaluation concerning whether the qualified privilege has been abused. The Court of Special Appeals correctly reasoned that

appellee "has the right notwithstanding the privileged character of the communication to go to the jury, if there be evidence tending to show actual malice, as where the words unreasonably impute crime, or the occasion of their utterance is such as to indicate, by its unnecessary publicity or otherwise, a purpose wrongfully to defame the plaintiff.... Or, malice may be established by showing that the publication contained matter not relevant to the occasion.... Expressions in excess of what the occasion warrants do not *per se* take away the privilege, but such evidence may be excess of malice...."

*Darvish,* 130 Md.App. at 276–77, 745 A.2d at 1140 (alterations in original) (quoting *Hanrahan,* 269 Md. at 29, 305 A.2d 151 (quoting *Fresh,* 73 Md. at 93–94, 20 A. 774)) (citing *Shapiro v.. Massengill,* 105 Md.App. 743, 777 n. 11, 661 A.2d 202 (1995)). Furthermore, "[w]hile the question of whether a defamatory communication enjoys a conditional privilege is one of law for the court, whether it has been forfeited by malice is usually a question for the jury." *Sindorf,* 276 Md. at 600, 350 A.2d at 700 (citing *Hanrahan,* 269 Md. at 29, 305 A.2d at 156; *Jump*

*v. Barnes,* 139 Md. 101, 114 A. 734 (1921); *Bavington v. Robinson,* 124 Md. 85, 90, 91 A. 777 (1914); *Fresh,* 73 Md. at 93, 20 A. 774); *see McDermott,* 317 Md. at 30, 561 A.2d at 1047 ("Our cases make clear that resolution of whether the privilege has been abused and whether malice exists is ordinarily a jury question." (citing *General Motors Corp.,* 277 Md. at 165, 352 A.2d 810)). Therefore, any competitive interest bias, if supported by evidence, could be the subject of a jury instruction and jury determination as to whether Respondent abused his qualified privilege. As such, the Court of Special Appeals was correct in stating that "[u]pon remand, the circuit court's jury instructions must conform to the elements of proof required to overcome [Respondent's] qualified privilege to utter the statements attributed to him." *Darvish,* 130 Md.App. at 277, 745 A.2d at 1140. In short, Respondent may lose the qualified privilege recognized here if Petitioner demonstrates that "the publication is made for a purpose other than to further the social interest entitled to protection . . . or can prove malice on the part of the publisher." *McDermott,* 317 Md. at 29, 561 A.2d at 1047 (citations omitted).

### III.

Petitioner additionally contends that the evidence of record and the verdict in the present case demonstrate that a qualified privilege defense, even had it been allowed to be asserted, would not have influenced the jury's conclusion, and thus, the Court of Special Appeals's judgment should be reversed and the jury verdict reinstated. According to Petitioner, the Circuit Court's refusal to permit Respondent to employ a qualified privilege defense was harmless error because the jury necessarily concluded that Respondent's assumedly defamatory statements were made with actual malice. We disagree with Petitioner and determine that the Circuit Court's disallowance of Respondent's defense of qualified privilege was not harmless error.[16]

---

16. Petitioner asserts that the Court of Special Appeals failed to reach the issue of harmless error. It seems to us, however, that the interme-

As stated, *supra* pp. 22–23, the existence of a qualified privilege is a question of law for the court, and whether that privilege has been abused is for the jury to decide. Moreover, "[i]t has been stated many times by this Court that error by the trial judge will not justify a reversal unless such error is prejudicial." *Sieland v. Gallo,* 194 Md. 282, 287, 71 A.2d 45, 46–47 (1950) (citing *Ross v. Phillips,* 148 Md. 165, 169, 129 A. 21 (1925); *Dippel v. Juliano,* 152 Md. 694, 702, 137 A. 514 (1927); *Tittlebaum v. Pennsylvania Railroad Co.,* 167 Md. 397, 404, 174 A. 89 (1934); *Biggs v. Hutzler Bros.,* 181 Md. 50, 56, 28 A.2d 609 (1942); *Barone v. Winebrenner,* 189 Md. 142, 55 A.2d 505, 506 (1947)). We conclude that the Circuit Court's decision not to permit evidence of, or to instruct on, the defense of qualified privilege was prejudicial.

It is in order first to explain how the jury was instructed (and not instructed) and what it necessarily decided (and what it did not decide necessarily). As noted *supra,* the Circuit Court, as a direct result of its pre-trial rulings on Petitioner's motions in limine, precluded Respondent from mounting a defense of qualified privilege. Concomitantly, the jury was not instructed regarding the defense of qualified immunity, or what conduct might defeat such a defense, let alone the standard of proof applicable to such an analysis.

Defining the elements that Petitioner, as plaintiff, was required to prove as to the tort of defamation, the trial judge did explain the following to the jury:

> [L]et me tell you what defamation is under Maryland law: Under Maryland law, to recover damages for defamation, a Plaintiff must prove each of the following elements. One, he must prove that the Defendant made a defamatory communication or statement about the Plaintiff.

diate appellate court did reach the issue and implicitly rejected it when stating that "[w]e are persuaded that [Respondent] was entitled to assert the qualified privilege defense, and to present evidence that the statements attributed to him were true." *Darvish,* 130 Md.App. at 274, 745 A.2d at 1138.

Now a statement is defamatory if it exposes a person to public scorn, hatred, contempt, or ridicule, thereby injuring that person's reputation, or causing that person emotional distress.

Two, the Plaintiff must prove that the Defendant published the statement to a third person, who reasonably recognized the statement as being defamatory. Whether the statement was in fact defamatory depends upon the plain and natural meaning of the statement, how it appears to have been meant by the Defendant, and how it was understood by those to whom it was communicated.

Three, the Plaintiff must prove that the statement was false. A false statement is one that is not substantially correct.

*Four, the Plaintiff must prove that the Defendant was at fault .*

And, five, the Plaintiff, must prove that he suffered harm as a result of the defamatory statement. (Emphasis supplied).

Regarding the various types of compensatory damages sought by Petitioner under the unitary defamation count, and distinguishing essentially between defamation *per se* and *per quod*, the court further explained:

Now, when a person has been defamed, but that person has not suffered actual injury, that person may still recover what we call nominal compensatory damages; that being for, say, a dollar. And that comes into play, and I will come back to that when we get further on in the instructions about what we call punitive damages.

If actual or constitutional malice has been proven, damages may be presumed when the words alone are self-evidently injurious and are subject to no double meaning. By that I mean this. You will recall that I had two different groups of alleged defamation statements.

One dealt with allegations that Mr. Darvish attacked the honesty of the Plaintiff and said that he manipulated finan-

cial statements. That is one group. The other group being just simply saying what his job wasn't.

Well, just simply saying what one's job is doesn't automatically to someone who doesn't know what the context of it is equate to defamation. If I were to say that someone's job doesn't include A, B, C, and D, that by itself is not defamatory.

And it would only be defamatory if you considered it in the context of what was said and the circumstances. But calling someone dishonest or that they manipulate financial statements may on the other hand be clear statements that standing alone are injurious.

Calling someone dishonest doesn't lead to any context to determine whether it is defamatory, and that is what we call defamation, *per se*. And in that instance, malice may be proven and damages—excuse me, but if malice has been proven, then damages from the statements of dishonesty, et cetera, may be presumed from the words alone.

Now, malice exists when a person who is making the statement deliberately lies, invents, or makes the statements with actual knowledge that they are false.

Now, to go back to what I said a moment ago. If a word, such as theft, dishonesty, and manipulation, are found by you to have been said, then because those words are self-evidently are defamatory, then you may assume that—let me back up. If you find that the statements were made with malice, that they were actually deliberate lies, inventions, or made with a statement that were false, those statements of dishonesty, et cetera, then you may assume that there is damages as a result of that in that instance.[17]

---

**17.** The instructions given by the trial judge regarding the role of malice in the jury's deliberation whether to award compensatory damages for defamation appear to have been requested by Petitioner, based on submitted written versions of Maryland Civil Pattern Jury Instructions (MPJI) (1998) 12:3(i) ("Malice-defined") and 12:8 ("Presumed Damages") found in the record. Although Respondent did not except to the instructions as given, their use in the context of this case, with regard to compensatory damages, was incorrect. Neither Gohari nor Darvish

Shortly following the completion of the instructions regarding compensatory damages, the judge explained the burden of proof standard the jury was to apply in its consideration of whether defamation had been proven and what amount of compensatory damages it might award:

Now, ladies and gentlemen, I have told you what the claims are that have been made by the Plaintiff, and what the Plaintiff must prove. Now, let me spend a minute with you telling you about the standard of proof.

And this will apply to everything except when I get to the punitive damage burden of proof. With regard to every other aspect of the truth of the cause of action, and proof that the Defendant did the things the Plaintiff said, and had the motive the Plaintiff said, and for damages, compensatory damages, the Plaintiff has the burden of proving each of these by what we call the preponderance of the evidence.

To prove by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence, which when considered and compares with the evidence opposed to it, has more convincing force, and produces in your mind a belief that it is more likely true than not true.

Regarding the punitive damages sought by Respondent, the judge subsequently informed the jury as follows, in pertinent part:

are asserted to be public officials or figures. The content of the allegedly defamatory statements are not argued to implicate public concerns or issues within the meaning of the law of defamation. *See Telnikoff v. Matusevitch,* 347 Md. 561, 590–95, 702 A.2d 230, 245–47 (1997). Absent public officials/figures as parties or public concerns/issues as the crux of the relevant statements, malice plays no role in the calculus of liability for defamation insofar as compensatory damages are concerned in this case. Instead, the plaintiff was required to prove only negligence. We do not approve of the instructions given in this case; however, because they were not excepted to by Respondent, we shall consider them appropriately for purposes of our analysis of Petitioner's "harmless error" argument.

Now, ladies and gentlemen, the Plaintiff in this case is seeking not only what we call compensatory damages, damages that would result directly to the Plaintiff as a result of the alleged acts of the Defendant, but the Plaintiff goes further and asks that the court or the jury also award what we call exemplary or punitive damages in each of the two counts; the one for defamation, and the one for tortious interference with the Kline contract.

Now, turning first to the defamation case, a person who has been defamed may be allowed the punitive damages where the Defendant published the defamatory statement with actual knowledge that it was false.

\* \* \* \* \*

Punitive damages serve as punishment and as a warning to others, and compensatory damages must have been awarded for punitive damages to be awarded. The amount of punitive damages must relate to the nature and extent of the conduct and harm caused.

\* \* \* \* \*

In the defamation case, you might recall that on the cases or in the instances where the Plaintiff claims that he called him dishonest, and manipulated, I said in that case that if you find no real damage, you may still grant what we call nominal damages, one dollar, for example, in damages.

\* \* \* \* \*

In order to recover punitive damages in either of these two counts, it is the Plaintiff's burden to prove by what we call clear and convincing evidence that the Defendant acted with actual malice. The Plaintiff must show actual malice with convincing clarity. For you to find actual malice, the evidence must be strong and positive.

Clear and convincing proof involves a degree of belief greater than the usual burden of proof by a fair preponderance of the evidence, but less than the burden of beyond a reasonable doubt.

You will recall that I used the two, and that it is in between. Clear and convincing evidence is more than a mere preponderance, but not so far as being beyond a reasonable doubt.

No appellate argument as to the legal correctness per se of these instructions has been briefed or argued to us by the parties.

The case was submitted to the jury on a written verdict sheet. The verdict sheet returned by the jury in this case, as concerns the defamation count, was as follows:

Count I—Defamation

 Check one (X)

 Do you find for the Plaintiff, Shahriar Gohari? X

 Do you find for the Defendant, John Darvish? X

Compensatory Damages

 If you decide in favor of the Plaintiff on Counts I, or II, state what sum, if any, you award in damages:

 Count I: $500,000.00 [18]

 Count II: $2,120,000.00

Exemplary Punitive Damages

 If you found in favor of the Plaintiff on Counts I, or II, and awarded any sum in compensatory damages in this Count, then state whether you find by clear and convincing evidence that:

Count I

(Defamation)

 1. the Defendant had actual knowledge that his defamatory remarks were false and, if so, whether you award a sum in exemplary damages and in what amount:

$ 0

---

18. The verdict sheet reflected "$2,620,000.00" scratched-out and "$500,000.00" entered in its place as compensatory damages for Count I, the defamation count.

From the foregoing, we are unable to conclude, as Respondent would have us, that the jury "necessarily" found actual malice on Petitioner's part, at least as that term was defined for the jury's consideration of compensatory damages regarding the defamation count in this case. Even considering what the jury was instructed, the verdict sheet does not make it more likely that the jury concluded that Darvish's liability for compensatory damages was predicated on actual malice than on simple negligence. The court's instructions parsed Darvish's alleged defamatory statements into two categories: (1) possibly false statements regarding Gohari's job responsibilities (the *per quod* statements), and (2) statements regarding dishonesty by Gohari and manipulation of financial statements (the *per se* statements). It is only with regard to the latter category, however, that the court further explained the possible application in the award of compensatory damages (nominal or greater) of actual malice (described by the judge as when one "deliberately lies, invents, or makes the statements with actual knowledge that they are false"). In the event the jury was satisfied by a preponderance of the evidence that such "actual malice" existed, the instructions permitted it to assume some amount of compensatory damages. The verdict sheet, however, neither explicitly called for a special verdict as to actual malice with regard to compensatory damages for the defamation count, nor did it parse the two categories of defamatory statements presented in the judge's instructions. It is possible that, under the instructions as given, the jury could have found Darvish liable based entirely on his negligence with regard to the *per quod* statements, for which the jury was not instructed actual malice need be considered in awarding compensatory damages. Thus, it becomes equally speculative for Petitioner to assert now that the jury's award of $500,000 in compensatory damages for Count I (defamation) was predicated on a finding of actual malice as to the *per se* statements, a scenario by which his appellate argument might have merit.

Petitioner argues that the present case is similar to *Dingle v. Belin*, 358 Md. 354, 749 A.2d 157 (2000). In *Dingle*, the

circuit court concluded that a claim for a breach of contract [19] made by the respondent was, "in effect, subsumed in her alternative claims of negligence [20] and, for that reason, entered judgment as a matter of law on the breach of contract action at the conclusion of the evidence." *Dingle,* 358 Md. at 357, 749 A.2d at 158. The Court of Special Appeals reversed this part of the trial court's judgment on the grounds that the breach of contract claim should have been submitted to the jury. *Belin v. Dingle,* 127 Md.App. 68, 79, 732 A.2d 301, 306 (1999), *rev'd,* 358 Md. 354, 749 A.2d 157 (2000). We reversed the holding of the Court of Special Appeals in this respect stating that the breach of contract claim was, "in fact, submitted to the jury, which necessarily found against [plaintiff]" and that "the essential underpinning of the claim was, in fact, submitted to the jury, which determined the issue in [defendant's] favor." *Dingle,* 358 Md. at 357, 378, 749 A.2d at 158, 170.

Petitioner argues that *Dingle* is similar to the present case because Petitioner, to prove defamation, had to demonstrate "that the alleged defamatory statements, if made, were false" and that Petitioner "at least 'act[ed] negligently in failing to ascertain' whether the defamatory statements were true.'" Petitioner's Br. at 20 (quoting *Jacron Sales Co.,* 276 Md. at 597, 350 A.2d at 698 (alterations in original)). Petitioner asserts that the jury verdict demonstrates that Petitioner met this burden and that the jury "'necessarily found that' [Re-

---

**19.** The breach of contract claim was premised on the petitioner, a surgeon, allegedly promising to respondent, his patient, that he would perform surgery on her, but then permitting another physician, a hospital resident doctor, albeit under petitioner's supervision, to perform part of the procedure. *Dingle v. Belin,* 358 Md. 354, 359, 749 A.2d 157, 159 (2000)

**20.** The claims of negligence were: (1) that petitioner was negligent for lack of informed consent in that petitioner breached his duty by failing to inform respondent of the scope of the responsibilities of the resident during her surgery and thus petitioner was unable to provide informed consent without this knowledge; and, (2) that petitioner was negligent in the performance of the surgery. *Dingle,* 358 Md. at 358–59, 749 A.2d at 159–60.

spondent] made the defamatory statements with actual malice"—the standard required to be met to find that Respondent had abused any qualified privilege that arguably may have been available. Petitioner's Br. at 21 (quoting *K & K Management, Inc. v. Lee,* 316 Md. 137, 150, 557 A.2d 965, 971 (1989)).[21]

 Petitioner's use of *Dingle,* and reliance on *K & K Management, Inc. v. Lee,* however, is inapposite. The essential underpinnings of the holdings in those cases are not present here; rather, permitting a qualified privilege to be asserted and considered undercuts the attempted analogy. We explained in *Marchesi* that "[t]he common law conditional privileges rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest." *Marchesi,* 283 Md. at 135, 387 A.2d at 1131 (citations omitted). As stated, *supra,* to establish a prima facie case for defamation,

> a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm.

Once the plaintiff demonstrates that a statement was defamatory, then the defendant has the burden of proving that the

---

**21.** In *K & K Management v. Lee,* 316 Md. 137, 557 A.2d 965 (1989), the jury determined that the defendant was liable for breach of contract. *Lee,* 316 Md. at 141, 557 A.2d at 967. We determined that the jury's verdict for the plaintiffs legally precluded a finding for the defendant on defendant's argument that damages should be limited if the plaintiffs were found to have breached. *Lee,* 316 Md. at 149–50, 557 A.2d at 971. We stated that the "jury necessarily found that the [plaintiffs] had not materially breached the Agreement. Because a breach by the [plaintiffs] was essential to the partial defense embodied in [the defendant's] requested instruction, [the defendant] was not prejudiced by the failure to so instruct." *Lee,* 316 Md. at 150, 557 A.2d at 971. The *Lee* case is unlike the present case because the jury's verdict here does not operate the same as it did in *Lee,* that is, it does not legally mandate the conclusion that the qualified privilege was abused.

defamatory statement was privileged, the existence of which privilege, as noted *supra*, is a question of law for the court. If the privilege is recognized the plaintiff nonetheless may attempt to show that the privilege was abused, a question for the jury, thus rendering the defendant liable for defamation. Demonstrating abuse of the privilege requires overcoming a higher standard than simply demonstrating that the statement was defamatory. As the Court of Special Appeals stated, assuming the existence of a qualified privilege, Respondent defamed Petitioner if:

> (1) the publication [was] made with malice, that is, with 'knowledge of falsity or reckless disregard for the truth ...,' *Marchesi v. Franchino*, 283 Md. at 139, 387 A.2d 1129. Restatement of Torts 2d § 600–602; (2) the statement was not made in furtherance of the interest for which the privilege exists, Restatement of Torts 2d § 603; (3) the statement is made to a third person other than one 'whose hearing is reasonably believed to be necessary or useful to the protection of the interest ...,' *General Motors Corp. v. Piskor*, 277 Md. 165, 173, 352 A.2d 810 (1976); Restatement of Torts 2d § 604; and (4) the statement includes defamatory matter not reasonably believed to be in line with the purpose for which the privilege was granted. Restatement of Torts 2d § 605.

*Darvish*, 130 Md.App. at 277, 745 A.2d at 1140 (internal quotation marks omitted) (alterations in original) (quoting *Mareck v. Johns Hopkins Univ.*, 60 Md.App. 217, 225, 482 A.2d 17 (1984), *cert. denied*, 302 Md. 288, 487 A.2d 292 (1985)); *see also Telnikoff v. Matusevitch*, 347 Md. 561, 594–95, 702 A.2d 230, 246–47 (1997). Because the record of the present case does not permit us to conclude that the jury necessarily found actual malice in any sense, the errors identified in Part II of this opinion are not harmless.

*Exxon Corp. v. Schoene*, 67 Md.App. 412, 508 A.2d 142 (1986), is informative here. In *Schoene*, as in the present case, the appellant argued that, in regard to a defamation claim, "the trial court erred in refusing to instruct the jury on the scope of the conditional privilege and whether it had been

forfeited by abuse." *Schoene*, 67 Md.App. at 419, 508 A.2d at 146. The Court of Special Appeals determined that the appellant was "entitled to have the jury instructed on the existence of . . . [the] conditional privilege" because the statements were made within the employer-employee context even though at the time the statements were made, the appellee was no longer an employee. *Id.* In concluding that the trial court erred in not instructing the jury regarding qualified privilege, the intermediate appellate court noted that the privilege was subject to forfeiture because "there was evidence from which the jury could have found such abuse." *Id.* In spite of this latter conclusion, the court noted that abuse of a qualified privilege is a question for the jury to resolve, and therefore, the court held that the trial court "erred in refusing to instruct the jury as to the conditional privilege applicable to [appellee's] statements and as to the manner in which that privilege could be abused." *Schoene*, 67 Md.App. at 422, 508 A.2d at 147. The same is true in the present case; if there exists evidence that the qualified privilege was abused, it becomes a question for the jury to decide. It follows that we cannot determine that the jury necessarily would have concluded that the qualified privilege was abused on this record.

The U.S. Court of Appeals for the Federal Circuit decided a similar case that is also instructive. In *Manbeck v. Ostrowski*, 384 F.2d 970 (D.C.1967), *cert. denied*, 390 U.S. 966, 88 S.Ct. 1077, 19 L.Ed.2d 1170 (1968), an attorney, appellee, sued the president of a local labor union, appellant, "in slander." 384 F.2d at 971. At trial, during a bench conference, appellant's attorney admitted that he had "inadvertently" failed to raise the qualified privilege issue at the pre-trial conference and that the exclusion of the privilege would be prejudicial to appellant. *Manbeck*, 384 F.2d at 972. The trial judge stated, however, that it would be unfair to interject that issue at that point in the litigation and "ruled that the defensive possibilities of the privilege could not be exploited." *Id.* The jury, without hearing the qualified privilege defense, returned a verdict for the appellee and awarded compensatory and puni-

tive damages. *Id.* On appeal, the court determined that the defense of privilege should have been permitted. *Id.*

The *Manbeck* court concluded that the exclusion of the privilege was error and rejected appellee's argument that the jury, "in awarding punitive damages, necessarily found that appellant's conduct possessed a degree of malice that would have operated to defeat the privilege." *Manbeck*, 384 F.2d at 976–77. The court stated that this argument

> overlooks important contrasts that admission of the defense could have made possible. With privilege ruled out, the range for evidentiary presentations was narrowed, and argument and instructions to the jury on the subject were scotched. Had the trial embraced privilege, not only could its scope have expanded in these respects, but new considerations would have emerged that might have persuaded a verdict different in both its compensatory and its punitive features. We think it clear, in the first place, that the factual picture before the jury could to some extent have been transformed. More evidence might have been forthcoming, and that which was received might have taken on a new look.

*Manbeck*, 384 F.2d at 977. The same is true in the present case where punitive damages were not awarded. The *Manbeck* court noted that when qualified privilege is involved, the nature of how one is determined to be liable for defamation changes; "words otherwise slanderous presumptively fall within the ambit of the privilege, and the burden rests upon the person maligned to show that they do not." *Id.*

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS.*