835 A.2d 262

Gail CARTER, et vir

v.

ARAMARK SPORTS AND ENTERTAINMENT
SERVICES, INC., et al.

No. 2358, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Nov. 6, 2003.

212

216

218

Marcia Stephenson (Norris C. Ramsey, on the brief), Baltimore, for Appellant.

Robert H. Ingle, III (Kimberly S. Grimsley, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., on the brief), Baltimore, for Appellee.

Argued before DAVIS, HOLLANDER and RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., Judge (Retired, Specially Assigned).

Appellants Gail Carter and her spouse appeal from the Circuit Court for Baltimore City's grant of summary judgment in this multi-count tort action in favor of both corporate and individual defendants, the appellees, and dismissing all of the counts in the Third Amended Complaint. The Carters sued Aramark Sports and Entertainment, Inc. (Aramark), and two individuals, Sabrina Knouse and David Milburn, bringing in their Third Amended Complaint allegations of malicious prosecution, interference with economic relations, abuse of process, defamation, intentional infliction of emotional distress, false imprisonment, aiding and abetting as to Ms. Knouse, as well as related counts for punitive damages and loss of consortium.

## Issues

Appellants raise myriad issues in their appeal but, at bottom, they contest the circuit court's entry of summary judgment, which dismissed their complaint in its entirety. For the following reasons, we affirm the circuit court in all respects.

### Summary Background and Course of Proceedings

This litigation has as its genesis certain events which took place on July 27, 1999. Appellant, Gail Carter, was employed as an usher by the Baltimore Orioles at the Oriole Park at Camden Yards Stadium for the 1999 baseball season, and was at work that day. Appellee Aramark supplies concession services to the stadium. Both Ms. Knouse, Aramark's human resources director, and Mr. Milburn, an Aramark security officer, also were working that day.[1]

On that date, prior to the first pitch of the Oriole's game, Ms. Carter was accused of participating with an Aramark vender, Ruth Brunson, in a "scheme" to reuse discarded Styrofoam yogurt cups for the sale of frozen yogurt. According to the allegations, Ms. Carter would collect discarded Styrofoam and plastic "helmet" cups, take them home to wash them, and then return the items to Camden Yards for resale by Brunson.[2]

When certain Aramark managers became aware of rumors of this activity, they investigated. Ms. Brunson's yogurt stand was audited on the spot, an employee dispatched to a nearby women's restroom to look for a supposed cache of Styrofoam cups, and Ms. Carter was told to report to an Aramark office at the stadium where she was confronted by these allegations. She was immediately suspended by the Orioles pending an investigation.

The allegations of the scheme ripened into criminal charges, when a complaint, accusing Ms. Carter of theft, was filed by

---

1. David Milburn was voluntarily dismissed prior to the entry of summary judgment. The remaining appellees/defendants, Aramark and Ms. Knouse, will be referred to collectively as "Aramark" unless otherwise necessary for a specific discussion.

2. In the hearing on summary judgment, counsel for Ms. Carter insisted that while her client collected the plastic baseball helmet cups, there was no reliable evidence that she likewise "collected" the Styrofoam cups. [*See, e.g.* E 461–64, 482] The circuit court was aware of this distinction, and told counsel: "I am not, I confess to you, focused on the physical composition of the cups themselves. It was the fact of cup collecting essentially which gave rise to the initial suspicions."

David Milburn, a Baltimore City Police Officer moonlighting with Aramark as a security officer. The criminal case went to trial in the district court after Ms. Carter refused an offer to have her case placed on the Stet docket. She was acquitted by the court on a motion for judgment of acquittal after the close of the State's case. In entering the acquittal, the district judge found:

> Okay. I've taken a look at the State's Exhibit, these 50–or–so cups that Ms. Knouse introduced. Of course, I read the statement of charges and the application for the statement of charges, and I'm very curious about the circumstances of the case.

> \* \* \*

> The Court finds that these cups are actually new. . . . But these cups are not used cups.

> \* \* \*

> The statement of charges says, "did steal frozen yogurt of Aramark, Incorporated." The application for the statement of charges is filled with a great deal of speculation not proven in court today, indicates that the defendant, Ms. Ruth Brunson, would receive Styrofoam cups collected after a baseball event. Those cups were then taken home, presumably by Ms. Carter, washed out and the same—"washed out same and give cups to defendant to resell. As customers would approach Defendant Brunson, Defendant Brunson would fill the cups with frozen yogurt, property of Aramark, Incorporated, keep $3.25 for each cup of yogurt sold that way. After the event, defendant and codefendant would divide the profits."

> Well, let's go it in reverse. We've never heard anything about commingling of monies between either of the defendants. That's an allegation that's not been proved. We've never [heard] anything about any cups being filled with any frozen yogurt, another allegation also not shown today. We haven't heard anything about Ms. Carter having taken these cups home and/or washed those out, another allegation, again speculative, not shown by any testimony today.

We do have testimony, according to one witness, and that's Mr. Sachs, that he saw Ms. Carter with a sleeve of cups in a duffel bag. Those cups were given to Ms. Brunson, but they're not the theft of the cups, and I do believe that they are ARA cups, and I have a sneaking suspicion that something was under foot with these cups, but the defendant, both of them, are charged with having stolen frozen yogurt. I haven't heard anything whatsoever about frozen yogurt having been stolen. I do believe that that may have been the plan involved, and I think it's a legitimate suspicion or speculation on the part of the state, but there's not been one scoop of yogurt discussed in this case whatsoever, and the defendants have only been charged with having stolen yogurt.

It may very well have been their intention. Their intention also could equally have been to make some type of mobile out of the Styrofoam cups, although that's stretching it and certainly not my belief or speculation.

But suffice it to say, there's been no yogurt stolen in this case. . . .

For that reason, I find both of you ladies not guilty of the offense.

In the wake of this acquittal, Ms. Carter filed the first of three complaints against these defendants in connection with the above events. After the usual pre-trial skirmishes, she lodged a "Third Amended Complaint" alleging all the above-referenced counts. Following a hearing on the defense's dispositive motion for summary judgment, the circuit court ruled in favor of Aramark on all counts. The court denied appellants' motion to reconsider.

Although appellants have framed a variety of issues, which will be addressed below, all their contentions on appeal implicate the propriety of the circuit court's grant of summary judgment as to all counts of their Third Amended Complaint.

We will recite additional facts and procedural landmarks of this case as will be necessary for the resolution of the issues before us.

## Discussion

### I.

The logical starting point for our analysis, therefore, lies with the language from the Maryland Rule governing this manner of summary disposition. That Rule dictates that "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). *See Rite Aid Corp. v. Hagley*, 374 Md. 665, 683, 824 A.2d 107 (2003); *Sterling v. Johns Hopkins Hosp.*, 145 Md.App. 161, 167, 802 A.2d 440, *cert. denied*, 371 Md. 264, 808 A.2d 808 (2002).

Our review over a circuit court's decision on summary judgment is plenary. *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship*, 375 Md. 522, 533, 826 A.2d 443 (2003); *Mayor and City Council of Baltimore v. Utica Mutual Ins. Co.*, 145 Md.App. 256, 282 n. 30, 802 A.2d 1070, *cert. granted*, 371 Md. 613, 810 A.2d 961 (2002), *appeal dismissed*, 374 Md. 81, 821 A.2d 369 (2003); *Sterling*, 145 Md.App. at 168, 802 A.2d 440. Pursuant to this *de novo* inquiry, we must discern whether a genuine dispute of material fact exists and will review the circuit court's legal conclusions for correctness. *Hagley*, 374 Md. at 683, 824 A.2d 107. "When ruling on a motion for summary judgment, a court must view the facts, including all inferences drawn therefrom, in the light most favorable to the opposing party." *Sterling*, 145 Md.App. at 167, 802 A.2d 440 (quoting *Jones v. Mid–Atlantic Funding Co.*, 362 Md. 661, 676, 766 A.2d 617 (2001)). *Accord, Hemmings*, 375 Md. at 535, 826 A.2d 443.

" 'A material fact is a fact the resolution of which will somehow affect the outcome of the case.' " *Sterling*, 145 Md.App. at 168, 802 A.2d 440 (quoting *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206 (2001) (quoting *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608, 614 (1985))). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Id.* (citing *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). And, as Chief Judge Bell recently observed:

> The party opposing a motion for summary judgment must produce admissible evidence to show that a genuine dispute of material fact, i.e., one "the resolution of which will somehow affect the outcome of the case," . . . does exist. . . . This requires more than "general allegations which do not show facts in detail and with precision."

*Hagley,* 374 Md. at 684, 824 A.2d 107 (citations omitted). Indeed, " 'conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[,]' " and an " 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.' " *Opals On Ice Lingerie v. Bodylines Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) (quoting *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 n. 14 (2d Cir.1981) (quoting 6 J. MOORE, FEDERAL PRACTICE ¶ 56.15(3) at 56–486 to 56–487 (2d ed. 1976))).

■■■ "The summary judgment procedure is not a substitute for trial." *Hagley,* 374 Md. at 683, 824 A.2d 107. "[I]f [the] facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law[.]" *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090 (1979) (quoting *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970)). Thus, a reasonable dispute over a material fact will preclude summary judgment, because its resolution lies with the jury. Again, where no material fact presented is in dispute, summary judgment is appropriate to resolve purely legal questions. *Sterling,* 145 Md.App. at 168, 802 A.2d 440.

■■■ We are mindful that summary judgment is generally inappropriate in cases involving abuse of process, defamation, false imprisonment, and malicious prosecution. *Hagley,* 374 Md. at 684, 824 A.2d 107 (citing *Laws v. Thompson,* 78 Md.App. 665, 669–687, 554 A.2d 1264 (1989)). *See Hemmings,*

375 Md. at 535, 826 A.2d 443 (quoting *Brown v. Dermer,* 357 Md. 344, 355–56, 744 A.2d 47 (2000)). Nevertheless, this disposition may properly obtain if the prerequisites for summary judgment are satisfied, to wit: the absence of a disputed issue of material fact and the presence of a legal basis for the entry of judgment. *See Hagley,* 374 Md. at 685, 824 A.2d 107 (citing *Gross v. Sussex, Inc.,* 332 Md. 247, 257, 630 A.2d 1156 (1993); *Driver v. PEPCO,* 247 Md. 75, 79, 230 A.2d 321 (1967)).

## II.

In contesting the entry of summary judgment on the malicious prosecution count, appellants contend that the criminal prosecution was initiated without probable cause. Under this general argument, appellants raise, explicitly or by implication, a host of assertions, which we shall address seriatim.[3]

### A.

### *Malicious Prosecution*

 Appellants' initial argument broadly contests the circuit court's determination of probable cause as a basis for malicious prosecution. This contention effectively relates to whether that court erred in granting summary judgment as to the count alleging malicious prosecution, Count I of the Third

---

3. In their first overall argument challenging the adequacy of the "probable cause," appellants offer Ms. Carter's acquittal in the district court as proof that the case for proceeding against her was unsupported. They further aver that there exists a genuine issue of material fact with respect to Mr. Milburn's employment status with Aramark, *viz.* whether he acted in an official capacity as a police officer, or whether he acted in the employ of Aramark when he lodged the charges against Ms. Carter with the commissioner. They contend that Aramark is not insulated from liability for malicious prosecution solely because the police and the commissioner acted on the charges initiated by Aramark, because of the lack of probable cause. They complain of the circuit court's reliance on hearsay information in granting summary judgment, challenge the court's "miscons[truction]" of certain facts and inferences, as well as the court's determination of matters of credibility on summary judgment, and state that the circuit court "should have drawn inferences, favorable to Appellants," from the district court's findings.

Amended Complaint, and whether the court properly disposed of that primary count's derivative charges, *viz.* Count II, punitive damages, and Counts XIII and XIV, those aiding and abetting allegations against Ms. Knouse with respect to malicious prosecution.

In a case of malicious prosecution, a plaintiff must establish "1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceedings in favor of the plaintiff." *Heron v. Strader,* 361 Md. 258, 264, 761 A.2d 56 (2000). *See Okwa v. Harper,* 360 Md. 161, 183, 757 A.2d 118 (2000); *DiPino v. Davis,* 354 Md. 18, 54, 729 A.2d 354 (1999); *Exxon v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146 (1978); *Green v. Brooks,* 125 Md.App. 349, 367, 725 A.2d 596 (1999). The first and final elements have been established in appellants' favor. The issue of probable cause has drawn the most attention in this appeal.

### The Acquittal

First, appellants maintain that the acquittal of the criminal prosecution undermines the determination of probable cause. We do not agree. An acquittal is not, by itself, evidence of a lack of probable cause. *Palmer Ford v. Wood,* 298 Md. 484, 492 n. 4, 471 A.2d 297 (1984). As the Court of Appeals has observed:

> [T]he fact of acquittal after trial on the merits is not evidence of a want of probable cause. *Prosser,* Torts (2d ed.), p. 656, §§ 98; *Restatement,* Torts, §§ 667, comment (c); *Western Union Telegraph Co. v. Thomasson,* 251 F. 833, 837 (C.C.A.4th.). This is said to be for the reason that the finding may be based on a mere lack of proof beyond a reasonable doubt, and throws no light on the sufficiency of the evidence on which the instigator acted at the time the proceedings were instituted, because the verdict may have been based on other evidence produced by the defense that was unknown to the instigator. We find nothing in the Maryland cases at variance with this view. In *Stansbury v.*

*Luttrell,* 152 Md. 553, 137 A. 339, a judgment for the plaintiff was reversed because of a failure to establish a want of probable cause, despite the fact that he had been acquitted of larceny after a jury trial. In *Safeway Stores, Inc. v. Barrack, supra,* [210 Md. 168, 122 A.2d 457] we held that the case was properly submitted to the jury because of the conflict in the evidence as to what occurred prior to the arrest. We referred to the fact that in *Nance v. Gall,* 187 Md. 656, [50 A.2d 120 (1946), 51 A.2d 535 (1947)], and in *Straus v. Young,* 36 Md. 246, it was said that acquittal before a magistrate would permit an inference of a want of probable cause. In both those cases, however, there was not an acquittal on the merits.... [D]ischarge by a magistrate on preliminary hearing may furnish some evidence of a want of probable cause, whereas acquittal after trial does not.... In the instant case we hold that the acquittal by the jury is not evidence of a want of probable cause[.]

*Norvell v. Safeway Stores, Inc.,* 212 Md. 14, 20–21, 128 A.2d 591 (1957).

As was stated in another fashion by the Fourth Circuit in applying Maryland law, "[p]robable cause does not require evidence sufficient to convict a person but only 'a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty.'" *Alvarez v. Montgomery County,* 147 F.3d 354, 360 (4th Cir.1998) (quoting *Palmer Ford,* 298 Md. at 493, 471 A.2d 297). In *Porterfield v. Lott,* 156 F.3d 563, 569 (4th Cir.1998), the court observed:

Probable cause requires more than "bare suspicion" but requires less than evidence necessary to convict.... "It is an objective standard of probability that reasonable and prudent persons apply in everyday life...." And when it is considered in the light of all of the surrounding circumstances, even "seemingly innocent activity" may provide a basis for finding probable cause.

(Citations omitted.)

To conclude on this point, we find instructive the observation by Judge Hill, writing for the Eleventh Circuit:

There is a substantial difference between the quantum of proof necessary to constitute sufficient evidence to support a conviction and that necessary to establish probable cause. Although we characterized [on direct appeal of the plaintiff's criminal conviction] the evidence against Kelly at trial as supporting little more than *"speculation and conjecture,"* this assessment does not mean that there was not probable cause to bring the charges.

*Kelly v. Serna,* 87 F.3d 1235, 1241 (11th Cir.1996).

### Hearsay Statements

Of particular focus in appellants' appeal is their charge that the circuit court relied on "inadmissible hearsay" in rendering the determination that probable cause existed in this case. They essentially complain that the "cumulation of information," *viz.* the statements, remarks, innuendo, and rumors from other ushers and stadium employees should not have formed the basis of the court's ruling, because "[there are] no witnesses claiming to have personal knowledge of a scheme[.]"

Aramark responds, first, that appellants failed to raise this issue before the circuit court, and, second, that such statements as were presented to Ms. Knouse were adequate to form the basis for probable cause.

### Preservation

As a preliminary matter, we address whether appellants preserved their hearsay theory for our consideration. Prompted by Aramark's preservation argument, appellants in their reply brief assure us that their objection to the "facts" which came to Ms. Knouse's attention was indeed brought before the circuit court. They cite the hearing on the motion for summary judgment, where the following exchange occurred:

THE COURT: Can I ask you this, [counsel]? Is your position here that these facts as just enunciated for the record and for everyone's understanding so we'll have a

common road map here, is your argument today that those facts are belied by other facts?

[COUNSEL]: These facts, we believe, are uncorroborated, unreliable, unverified, quote/unquote "facts."

Appellants further respond to the preservation argument that in their motion to reconsider the entry of summary judgment, the "issues concerning hearsay were raised."

Maryland Rule 8–131(a), repeatedly quoted by this Court, provides in part that "[o]rdinarily, the appellate court will not decide any other [than a jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

This issue is before us, but just barely. In our view, appellants' complaint, that the evidence in question was "uncorroborated" and "unreliable," provides a sufficient basis for us to consider their complaint on appeal that it is inadmissible hearsay. The following passage from the Seventh Circuit is instructive:

. . . Spiller's argument on appeal relates to the government's use of the ledgers to show that he produced 28,000 grams of crack cocaine. In other words, he objects to their use to prove the truth of the information they contained, a hearsay objection. The government maintains that since the initial admission of the records was appropriate under Rule 404(b), and since Spiller did not make a continuing hearsay objection, Spiller forfeited his right to object to the use of the ledgers. Generally, to preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection. Thus, not just any objection will save an issue for review—neither a general objection to the evidence nor a specific objection on a ground other than the one advanced on appeal is enough. Rather, this Court will consider an argument only if the party asserting it made a

proper, timely and specific objection on the same ground at trial, that is, unless plain error is manifest.

Thus, we must decide whether Spiller's objections that the ledgers were "irrelevant, immaterial and uncorroborated" is sufficient to preserve the issue that they constitute inadmissible hearsay. Spiller's objection regarding relevance and materiality is not sufficient to preserve a hearsay objection for appellate review. In fact, much hearsay, even inadmissible hearsay, is relevant and material. However, Spiller's objection based on lack of corroboration is probably sufficient. Lack of reliability and corroboration go to the heart of the hearsay objection.

*United States v. Spiller*, 261 F.3d 683, 689–90 (7th Cir.2001). Thus, while we disagree with appellants' assertion that they effectively presented a hearsay objection in their motion for reconsideration, we do conclude that counsel's above-referenced objection at the hearing to the lack of corroboration is sufficient to preserve this issue.

### Nature and Use of Hearsay Statements

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. This is the traditional definition of hearsay as articulated in Md. Rule 5–801(c). "Generally, statements made out-of-court that are offered for their truth are inadmissible as hearsay, absent circumstances bringing the statements within a recognized exception to the hearsay rule." *Su v. Weaver*, 313 Md. 370, 376, 545 A.2d 692 (1988) (citing *Kapiloff v. Locke*, 276 Md. 466, 471, 348 A.2d 697 (1975)).

The Hearsay Rule is therefore a rule of exclusion, and thus the proponent of the disputed evidence bears the burden of showing that the Rule does not apply. *See Cassidy v. State*, 74 Md.App. 1, 7–8, 536 A.2d 666, *cert. denied*, 312 Md. 602, 541 A.2d 965 (1988). But as was pointed out by Judge

Moylan, sitting by designation in the Court of Appeals, "[t]he acceptability of hearsay, even . . . compounded, in the accumulation of probable cause is fundamental." *Brewer v. Mele,* 267 Md. 437, 450 n. 12, 298 A.2d 156 (1972) (citing cases).[4]

We need venture no farther in our consideration of appellants' hearsay argument. The proper consideration of the various statements that are implicated in Aramark's actions is whether they formed a reasonably objective basis at the time upon which Aramark could have relied to go forward with those actions which were adverse to Ms. Carter. The statements were the proper subject of the circuit court's analysis on summary judgment, even though they were not admissible in Ms. Carter's trial in the district court.

---

4. Certainly, the Maryland summary judgment rule requires that supporting affidavits contain such facts "as would be admissible in evidence." Md. Rule 2–501(c). This evidentiary quandary was succinctly addressed by a federal district court:

"On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736 (2d Cir.1998) (citing *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997)). Nonetheless, when the dispute concerns whether officers had probable cause to obtain a search or arrest warrant, the district court properly considers hearsay evidence that was used to obtain the warrant in question. *See United States v. [One Parcel of Property at] 15 Black Ledge Drive,* 897 F.2d 97, 101 (2d Cir.1990); *United States v. [Premises and Real Property at] 4492 S. Livonia Rd., [N.Y.]* 889 F.2d 1258 (2d Cir.1989).

*DeFelice v. Ingrassia,* 210 F.Supp.2d 88, 92 (D.Conn.2002), *aff'd,* No. 02–7758, 66 Fed.Appx. 240 (2d Cir.2003).

We hasten to note, moreover, that such statements as are at issue here may not offend the hearsay rule if the evidence was "offered for some purpose other than to prove the truth of the matter asserted therein[.]" *See Ashford v. State,* 147 Md.App. 1, 75, 807 A.2d 732 (quoting *Ali v. State* 314 Md. 295, 304, 550 A.2d 925 (1988)), *cert. denied,* 372 Md. 430, 813 A.2d 257 (2002). *See also Daniel v. State,* 132 Md.App. 576, 589, 753 A.2d 545, *cert. denied,* 361 Md. 232, 760 A.2d 1106 (2000). The statements that prompted Ms. Knouse to act may show her good faith, and not to establish the truth of the matters asserted by the informants. *Cf. Tate v. Connel,* 3 Ariz.App. 534, 416 P.2d 213, 217 (1966) (communications between malicious prosecution defendant and attorney who advised prosecution admitted solely to establish good faith) (citing 2 WIGMORE, EVIDENCE § 258(c), p. 80 (3d ed. 1940)).

*Probable Cause*

■■■■■ We now consider the issue of whether there was probable cause, the presence of which will bar the malicious prosecution and related counts. *See Kennedy v. Crouch,* 191 Md. 580, 587, 62 A.2d 582 (1948). "Probable cause, as the term implies, is a concept based on probability." *Okwa,* 360 Md. at 183, 757 A.2d 118. The Court of Appeals continued in *Okwa:*

> It does not have a technical definition. Rather, the question of whether a law enforcement officer had probable cause to make a particular arrest is determined on "factual and practical considerations of everyday life on which reasonable and prudent [people] . . . act." . . . We have defined probable cause as " 'facts and circumstances sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.' " *DiPino,* 354 Md. at 32, 729 A.2d at 361 (citations omitted) (alterations in original).

*Okwa,* 360 Md. at 183–84, 757 A.2d 118 (citations omitted). Judge Hollander, writing for this Court in *Green,* refers us to the following instructive statement by the Court of Appeals:

> "Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious [person] in believing that the accused is guilty." . . . It is equally clear that if the facts, and the inferences to be drawn therefrom, relied on to constitute probable cause are clear and undisputed, the question is one of law for the court; where the facts are contested, however, whether they are proved is a question for the jury.

*Green,* 125 Md.App. at 368, 725 A.2d 596 (quoting *Exxon Corp. v. Kelly,* 281 Md. at 697–98, 381 A.2d 1146). Malice may be inferred from the lack of probable cause. *Okwa,* 360 Md. at 189, 757 A.2d 118.

We recognize that probable cause cannot rest on rumor. The record, nevertheless, contains evidence of "circumstances sufficiently strong in themselves" to justify a reasonable belief that Ms. Carter was guilty of an offense. On July 27, 1999,

Ms. Knouse had been informed that Ms. Carter had collected Styrofoam cups and miniature plastic baseball helmets after the games. She was told that one Sean Clark, an Aramark employee, reported that a Steve Sachs, a bartender for Aramark, had seen Ms. Carter pass a number of Styrofoam cups to Ms. Brunson, an Aramark yogurt vender, and that the latter had been seen entering the ladies room with a bag during an audit of her stand.

Ms. Knouse was informed by an Orioles usher, Mary Ellen Myers, of rumors that Ms. Carter and Ms. Brunson were involved in selling yogurt. In a deposition, Ms. Myers testified that she had heard rumors [5] that Ms. Carter "was collecting the caps [6] and taking them home and bringing them back to the yogurt stand ... to give it [the caps] to Ms. Ruthie [who] would use that as inventory. That's how they made their money." At her deposition, Ms. Myers continued:

> Other than collect [the helmets in which yogurt was served] after the games, [Ms. Carter] would put them in her bag and she would, you know, just go up and down the aisle, and seating area and collect the helmets.
>
> \* \* \*
>
> It seemed like it was basically every game, you know.
>
> \* \* \*
>
> ... At times, I mean that was the summer it was very hot and Gail would be constantly at the Yogurt Tree.... It came to a time that, you know, she was actually helping Ms. Ruthie serve the yogurt[.] ... And then, you know, we were all told as a group no more being at the yogurt place.

---

5. Ms. Myers said that she had heard fellow employees—a fellow named "Gary," another by the name of "Tim," Mary Strong and Vernon Paige—joking about, or discussing, Ms. Carter's activities with the yogurt cups.

6. Ms. Myers said that Ms. Carter would take to the yogurt stand a small insulated bag, large enough to carry a six pack. She recalled that Ms. Carter, when collecting cups, appeared to have "a regular recyclable bag."

Ms. Myers said that she had not raised this as an issue before July 27, 1999. On that date, however, she had stopped by the bar where an Aramark bartender, Steve Sachs, was working, for some ice. Ms. Brunson's yogurt stand was nearby, but Sachs was apparently unaware of the rumors about Ms. Carter. Ms. Myers recalled:

> And all of a sudden [Sachs] just started yelling and went—calling [yelling for] his supervisor, I don't remember the name, and I went back to my section. So I didn't find out until after the fact what had happened. . . .
>
> * * *
>
> That Gail . . . was taking Styrofoam cups home too . . . and Ms. Ruthie got caught putting the cups in the ladies bathroom.
>
> * * *
>
> [Ms. Myers did not actually see anything.] I just saw Gail there with her bag on the yogurt place, which it was always, you know, whenever she went there, she had her bag there, but I didn't see anything transpire, no.

Ms. Myers never saw Ms. Carter and Ms. Brunson exchange money. Nor did she see the latter sell yogurt in cups allegedly given to her by Ms. Carter.

Diane Taylor, an employee, signed a statement reporting that on July 26, 1999, she had seen Ms. Carter "picking up the baseball cups [presumably plastic helmets] left behind by the fans[.]"

Subsequent to July 27, 1999, Aramark obtained a statement from one "Antionette R." who wrote that Ms. Brunson would come to the writer's stand and ask Antionette "to washout cups[.]" Steve Berry, the Aramark supervisor contacted by bartender Sachs, recalled in a written statement that, while conducting an audit of Ms. Brunson's yogurt stand on July 27, Ms. Brunson left for the ladies' room with her bag. A subsequent search of that restroom yielded a bag containing Styrofoam cups underneath the "trash bag" in the refuse can.

The circuit court was entitled, on the extant record, to conclude that appellants failed to raise a genuine issue of material fact with respect to the above recitations. Cautiously avoiding reliance on rumors and reports from unidentified ushers who actually saw Ms. Carter rinse cups, we ourselves conclude that undisputed facts give rise to those facts and circumstances sufficient to warrant Aramark management and Ms. Knouse in believing that Ms. carter had committed or was committing an offense. Moreover, appellants have failed to point to any dispute of material facts that would militate against an affirmance of the circuit court's decision below. *Compare, Exxon Corp.*, 281 Md. at 697–98, 381 A.2d 1146 (court points to conflict in evidence which had formed basis for decision to prosecute).

Aramark's case is further strengthened by the fact that Officer Milburn consulted an Assistant State's Attorney, Marshall Shure, before submitting the amended police report that gave rise to the prosecution. Officer Milburn had initially prepared a lengthy police report outlining the facts presented to him by Ms. Knouse and Aramark, and stating that the charge was "flim-flam larceny." Milburn testified at his deposition that he changed this to "theft" after consulting with Mr. Shure.

▮ Non-lawyers, such as Aramark, who rely on the advice of counsel, may in some circumstances raise this as a defense to an allegation of malicious prosecution. In *Brewer v. Mele*, 267 Md. 437, 453–54, 298 A.2d 156 (1972), the Court ruled that a deputy sheriff who brought criminal charges was "fully protected by having sought and received the advice of counsel, specifically the State's attorney, provided only that he shall have made a full and fair disclosure of everything within his knowledge and information and that he subsequently shall have followed the advice given." We believe that *Brewer v. Mele* applies here, because Officer Milburn consulted with Mr. Shure about the appropriate charge. Although appellants accuse Ms. Knouse of making falsehoods in her report, which informed Officer Milburn in his actions, we perceive no inaccu-

racies that would render inapplicable the rule insulating malicious prosecution defendants from liability because they consulted with counsel.[7]

Because Aramark's, and Ms. Knouse's, actions were supported by probable cause, we shall therefore affirm the circuit court's entry of summary judgment as to Counts I and II and their related punitive damages claims, and the relevant (as to malicious prosecution) counts against Ms. Knouse.

## B.

### *Defamation and Intentional Interference*

■ Appellants assail the circuit court's entry of summary judgment on the related counts of defamation and intentional interference of economic relations, *viz.* Ms. Carter's employment with the Orioles.

Ms. Carter alleged the torts of "intentional interference with economic relations" and "defamation" respectively in Counts III and VII of the Third Amended Complaint. These theories of action were treated similarly by the circuit court, which entered summary judgment for Aramark on the basis of privilege.

### *Defamation*

■ This Court has outlined the elements of the tort of defamation in cases involving a plaintiff who is not a public figure:

In [such a case] a prima facia case of defamation requires proof of the following elements:

(1) that the defendant made a defamatory communication—i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement

---

7. We do not agree with Aramark that Officer Milburn acted as a neutral Baltimore City police officer. His report was prepared "for [his] superiors at Camden Yards."

was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

*Peroutka v. Streng,* 116 Md.App. 301, 311, 695 A.2d 1287 (1997) (quoting *Shapiro v. Massengill,* 105 Md.App. 743, 772, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995)). *See Gohari v. Darvish,* 363 Md. 42, 54, 767 A.2d 321 (2001). "A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Batson v. Shiflett,* 325 Md. 684, 722–23, 602 A.2d 1191 (1992) (quoting *Bowie v. Evening News,* 148 Md. 569, 574, 129 A. 797 (1925)). In this instance, the allegation that a person is a thief constitutes defamation *per se. See* R.J. Gilbert and P.T. Gilbert, MARYLAND TORT LAW HANDBOOK, § 6.4 (3d ed. 2000).

 A defendant in a defamation action may interpose the defense of a qualified, or conditional, privilege. *Gohari,* 363 Md. at 55, 767 A.2d 321. The Court there observed that a defendant would not face liability for an otherwise defamatory statement "where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general." *Id.* at 56, 767 A.2d 321 (quoting *Marchesi v. Franchino,* 283 Md. 131, 135–36, 387 A.2d 1129 (1978)).

The alleged defamatory communications made by Aramark to the Orioles, and to employees of each organization, are defended on the basis of the "shared interest" or "common interest" conditional privilege. The Court of Appeals explained this privilege in a passage that merits extensive quotation:

An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which

another sharing such common interest is entitled to know....

In determining what qualifies as a common interest, we have stated that a common interest may include "interests in property, business and professional dealings," *id.*, and can "inhere in business dealings between the publisher and the recipient." ... Dobbs has elaborated:

> Common interests are usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor.... The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit.... The privilege does not arise in the first place unless the communication relates in some degree to the common interest, and once the privilege arises it is lost if it is abused by malice or excessive publication.

[DAN B. DOBBS,] THE LAW OF TORTS [(2000)], *supra*, § 414, at 1160–61.

*Gohari*, 363 Md. at 57–58, 767 A.2d 321 (quoting *Hanrahan v. Kelly*, 269 Md. 21, 28, 305 A.2d 151 (1973)).

It is clear that information held by Aramark, that Ms. Carter and Ms. Brunson might have been engaged in the activities in question here, would be important to the Baltimore Orioles. For example, the purported sale of a dairy product in previously used Styrofoam or plastic helmet cups would indeed implicate health as well as economic concerns. In the final analysis, there is no question that because one of the employees in the alleged "scheme" was an employee of the Baltimore Orioles, and the supposed events took place at Oriole Park at Camden Yards, "the circumstances are such as to lead to the reasonable belief that the third person's interest is in danger." *Gohari*, 363 Md. at 59, 767 A.2d 321 (quoting RESTATEMENT (SECOND) OF TORTS, § 595, at 270).

Appellants' theory on this question is that Aramark abused any conditional privilege because the communications were

made in bad faith. In Count VII of the Third Amended Complaint, appellants asserted the following against Aramark:

[¶] 53. On or about July 27, 1999, Defendant through its agents servants and employees made oral statements that Plaintiff had committed the crime of theft from Defendant Aramark to her employer.

[¶] 54. Defendant Aramark also spread the false allegations of theft to others among the employees and Plaintiff's fellow employees without a legitimate purpose and with full knowledge that Plaintiff would suffer great harm.

Third Amended Complaint ¶¶ 53, 54. In their response to Aramark's summary judgment motion, appellants asserted that Aramark's own investigation proved "that their accusation of [Ms.] Carter on July 27, 1999 was false. Thus, any publication that Plaintiff Carter is a thief was done with malice or reckless disregard for the truth."

### Tortious Interference

The tort of intentional interference with economic relations "pertains to prospective business relations, or to contracts terminable at will[.]" *Kramer v. Mayor and City Council of Baltimore*, 124 Md.App. 616, 637, 723 A.2d 529, *cert. denied*, 354 Md. 114, 729 A.2d 405 (1999). Judge Salmon set forth the elements of this tort in *Kramer*, stating that a plaintiff must prove:

"(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[ ] in [her] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

*Kramer*, 124 Md.App. at 637–38, 723 A.2d 529 (quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663 (1984) (quoting *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962 (1909))). This cause of action applies to the interference

with the plaintiff's "at-will" employment.[8] *Kramer,* 124 Md. App. at 637, 723 A.2d 529 (citing *Macklin v. Robert Logan Assocs.,* 334 Md. 287, 299, 639 A.2d 112 (1994)). As further pointed out by Judge Salmon, the "wrongful or unlawful acts necessary to support the tort" are:

[W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and "violence or intimidation, defamation, injurious falsehood or other fraud, violations of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith."

*Kramer,* 124 Md.App. at 638, 723 A.2d 529 (quoting *Alexander & Alexander, Inc. v. B. Dixon Evander Assocs., Inc.,* 336 Md. 635, 657, 650 A.2d 260 (1994)) (citing *K & K Management v. Lee,* 316 Md. 137, 166, 557 A.2d 965 (1989) (quoting PROSSER, LAW OF TORTS § 130, 952–953 (4th Ed. 1971))).

### *Conclusion—Privilege*

We disagree with appellants that the circuit court erred in granting summary judgment with respect to the related torts of defamation and interference with economic relations on the basis of privilege. A defendant in a defamation action may interpose the defense of a qualified, or conditional, privilege, and thus would not face liability for an otherwise defamatory statement "where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or

---

8. One commentator in the middle of the last century noted:

In general, no person, or combination of persons, has any right to prevent another from earning a livelihood by engaging in any craft, business or profession, and where it is apparent that the only motive which impels interference is to prevent such right, the law interposes to prevent its violation or to grant a remedy in damages for its violation, to prevent interference to obtain employment, or to cause a discharge therefrom.

FRANCIS A. SHAW, A COMPENDIUM ON INTERFERENCE § 5 at 151–52 (1942). *See also id.* at § 6 ("Discharge due to Slander or Libel").

third parties, or where his declaration would be of interest to the public in general." *Gohari v. Darvish,* 363 Md. 42, 56, 767 A.2d 321 (2001) (quoting *Marchesi v. Franchino,* 283 Md. 131, 135–36, 387 A.2d 1129 (1978)). *See Darvish v. Gohari,* 130 Md.App. 265, 274, 745 A.2d 1134 (2000), *aff'd,* 363 Md. 42, 767 A.2d 321 (2001). Chief Judge Murphy continued in *Darvish:*

Conditional or qualified privileges

[T]he common law recognized that a person ought to be shielded against civil liability for defamation where, in good faith, he publishes a statement in the furtherance of his own legitimate interest, or those shared in common with the recipient or third parties ...

\* \* \*

According to the Restatement (Second) of Torts § 595(1), a qualified privilege may be claimed where the defendant believes "there is information that affects a sufficiently important interest of the recipient," and where the publication may be made "within the generally accepted standards of decent conduct."

*Id.* 130 Md.App. at 274–75, 745 A.2d 1134 (quoting *Marchesi v. Franchino,* 283 Md. 131, 135, 387 A.2d 1129 (1978) and RESTATEMENT (SECOND) OF TORTS §§ 595(1), (2)).

 The determination of whether a privilege existed is made as a matter of law if there is no factual dispute about the common interest or duty which gave rise to the disclosures at issue. *See Sindorf v. Jacron Sales Co.,* 27 Md.App. 53, 69, 341 A.2d 856 (1975), *aff'd,* 276 Md. 580, 350 A.2d 688 (1976).

 The conditional or qualified privilege may be lost by abuse where

(1) the publication is made with malice, that is, with "knowledge of falsity or reckless disregard for truth ...", *Marchesi v. Franchino,* 283 Md. at 139, 387 A.2d 1129. Restatement of Torts 2d § 600–602; (2) the statement was not made in furtherance of the interest for which the privilege exists, Restatement of Torts 2d § 603; (3) the statement is made to a third person other than one "whose hearing is

reasonably believed to be necessary or useful to the protection of the interest ...", *General Motors Corp. v. Piskor,* 277 Md. 165, 173, 352 A.2d 810 (1976); Restatement of Torts 2d § 604; and (4) the statement includes defamatory matter not reasonably believed to be in line with the purpose for which the privilege was granted. Restatement of Torts 2d § 605.

*Happy 40, Inc. v. Miller,* 63 Md.App. 24, 32–33, 491 A.2d 1210, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985). We understand, as Judge Karwacki noted in *Happy 40,* that whether a qualified privilege has been abused is generally a question of fact for the jury. *Id.* at 34, 491 A.2d 1210. Nonetheless, where there is no evidence of abuse, and certainly nothing in the record to raise a genuine issue of material fact with respect to this issue, the question may be determined on summary judgment and thus be subject to *de novo* review on appeal. *Cf. id.* (cases involving employer-employee relationship, clearly an analog to the present case).

Appellant, before the circuit court and again on appeal, has failed to articulate any genuine issues of material fact that Aramark or its agent Ms. Knouse forfeited the qualified privilege, which was present to permit Aramark to inquire at the July 27, 1999 meeting with Ms. Carter to investigate concerns that had come to light about her purported activities with Ms. Brunson. "There was no evidence that [Aramark] used '[the investigation] as an opportunity to wreak [its] ill-will upon [appellant] to abuse and vilify [her], and to injure [her] in the estimation of [her] neighbors.'" *Id.* at 36, 491 A.2d 1210.

The circuit court determined that the alleged defamatory communications between Aramark and Knouse were privileged, applying this both to the defamation and interference claims. In view of the above, we conclude that the court correctly entered summary judgment against appellants on the defamation and tortious interference counts. We note, as to the latter count, that appellants have failed to raise a genuine issue of material fact with respect to deposition testimony that Ms. Carter was terminated by the Orioles for reasons unrelated to the events of July 27, 1999.

We affirm the entry of summary judgment on the defamation and tortious interference counts, as well as the derivative punitive damages charges, and the related aiding and abetting counts with respect to Ms. Knouse.

## C.

### *Abuse of Process*

" 'The tort of abuse of process occurs when a party has wilfully misused criminal or civil process after it has issued in order to obtain a result not contemplated by law.' " *Palmer Ford,* 298 Md. at 511, 471 A.2d 297 (quoting *Krashes v. White,* 275 Md. 549, 555, 341 A.2d 798 (1975)). Judge William Adkins elaborated on the elements of the tort:

"The essential elements of the abuse of process as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding." Put otherwise:

"To sustain an action of abuse of process the plaintiff must show that:

1. the defendant wilfully used process for an illegal purpose;

2. to satisfy the defendant's ulterior motive; and

3. the plaintiff was damaged by the defendant's perverted use of process."

*Berman v. Karvounis,* 308 Md. 259, 262, 518 A.2d 726 (1987) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 121 at 857 (4th ed. 1971) and R.P. Gilbert, P.T. Gilbert and R.J. Gilbert, MARYLAND TORT LAW HANDBOOK, § 5.0 (1986)).

We conclude that the record, even viewed indulgently in favor of appellants, does not raise a genuine issue of material fact with respect to whether Aramark and Ms. Knouse wilfully used the criminal prosecution for any ulterior purpose. Citing deposition testimony from Ms. Carter and Ms. Knouse, appellants maintain, first, that Aramark sought "to cause Mrs. Carter to lose her job and secure a conviction at any cost[,]"

and that Ms. Knouse "was motivated by something other than bringing an offender to justice" because she "wanted someone to know what was going on when he decided to initiate prosecution[.]"

Yet they raise no genuine issue with respect to whether Ms. Knouse and Aramark sought to use the prosecution for ulterior motives. There is no showing whatsoever that the goal was to bring about Ms. Carter's termination for its own sake. Certainly, Aramark would strive to end employee theft and alleged acts that would pose a health risk. In the final analysis, the facts do not bear the weight of appellants' abuse of process claim.

The circuit court thus correctly granted summary judgment on the abuse of process, and derivative punitive damages and aiding and abetting counts.

## D.

### *Intentional Infliction of Emotional Distress*

In order to establish the tort of intentional infliction of emotional distress, the tort plaintiff must establish: " '(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe.' " *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95 (2000) (quoting *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977)).

In her count alleging intentional infliction of emotional distress, Ms. Carter asserts that she has "suffered, and will continue to suffer, severe and extreme emotional distress." This count also incorporates by reference the other allegations of the Third Amended Complaint, which assert that Ms. Carter has also suffered "mental anguish." Appellants' intentional infliction of emotional distress claim is unsuccessful because they failed adequately to plead the tort with the requisite specificity, and then failed to raise a genuine issue of

material fact with respect to the severity of the emotional distress suffered.

 In granting summary judgment, the circuit court explained from the bench that the "pleadings do not present the kind of factual detail that I think the case law requires[.]" He further ruled that Aramark's actions did not rise to the level of the extreme and outrageous conduct required for this tort. We agree and will affirm on these points.[9]

*i.*

This Court has stated that a complaint alleging intentional infliction of emotional distress must allege and prove the elements for that tort "with specificity." *Foor v. Juvenile Services Admin.*, 78 Md.App. 151, 175, 552 A.2d 947, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989). The allegations contained in the specific count alleging intentional infliction of emotional distress, and generally in the Third Amended Complaint as a whole, fail to go beyond conclusory allegations of the conduct that is claimed to be extreme and outrageous.

There is also a glaring lack of specificity in the pleadings as to the severity of the distress suffered by Ms. Carter. We believe that the circuit court's first rationale in granting summary judgment, a lack of factual detail in the complaint,

---

**9.** We may not, ordinarily, affirm a summary judgment on a basis not relied upon by the circuit court, *Hemmings v. Pelham Wood Ltd. Liability Ltd. P'ship*, 375 Md. 522, 534, 826 A.2d 443 (2003), and will not do so here. Although not squarely addressed by the circuit court, we note in passing that appellants did not present legally sufficient evidence to raise a genuine issue of material fact with respect to the severity of Ms. Carter's emotional distress. We are mindful that a plaintiff need not be totally disabled by her emotional distress. *See Figueiredo–Torres v. Nickel*, 321 Md. 642, 656, 584 A.2d 69 (1991) (quoting *B.N. v. K.K.*, 312 Md. 135, 148, 538 A.2d 1175 (1988)). We also note that Dr. Mayer Liebman, in an April 19, 2001 report, diagnosed "Major Depressive Disorder, Single Episode, Moderate," "Post-traumatic Stress Disorder, Chronic, Provisional," and "Anxiety and Depression Causing Headaches[,]" and opined that Ms. Carter's "prognosis is fairly good over time." We would conclude, were the issue squarely before us, that appellants have not adduced legally sufficient evidence of severe emotional distress so as to satisfy the stringent requirements for this tort.

does embrace the failure adequately to plead not only "extreme and outrageous" conduct, but also the "emotional distress" element for intentional infliction of emotional distress. We therefore will affirm the entry of summary judgment as to the count alleging intentional infliction of emotional distress on that basis as well.

In the final analysis, even viewing the complaint, and, on summary judgment, the record in the light most indulgent to appellants, we nonetheless must conclude that the facts, as alleged and taken as true in Ms. Carter's favor, do not make out an adequate case for intentional infliction of emotional distress. Simply put, the Third Amended Complaint fails to allege with the requisite specificity either the outrageous conduct or the "emotional distress" elements of Ms. Carter's theory of action for intentional infliction of emotional distress. *See Manikhi*, 360 Md. at 368–70, 758 A.2d 95 (citing cases). We recognize that the "character of a defendant's conduct is in itself important evidence" of the existence of severe emotional distress. *Id.* at 368, 758 A.2d 95 (quoting *Harris*, 281 Md. at 571, 380 A.2d 611). Nonetheless, even taking into account all of the allegations of the Third Amended Complaint, we affirm the entry of summary judgment on this count.

*ii.*

In the alternative, we conclude that appellants have not presented sufficient evidence of the extreme and outrageous conduct required to make out a case for intentional infliction of emotional distress. The standard for actionable conduct under this tort is exacting and stringent. Plaintiffs' counsel acknowledged so before the circuit court. When the motions judge, in passing on the level of "outrageous conduct" needed for this tort, opined that "[t]he standard in this [S]tate is ... the Himalayan Mountains ... [,]" plaintiffs' counsel replied, "Yes sir."

Judge Karwacki, in reviewing the relevant Maryland cases as well as the Restatement, reiterated that "[f]or conduct to meet the test of 'outrageousness,' it must be 'so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Batson v. Shiflett*, 325 Md. 684, 734, 602 A.2d 1191 (1992) (quoting *Harris*, 281 Md. at 567, 380 A.2d 611). We conclude, as did Judge Karwacki in *Batson*, that an acceptance of appellants' view, that the conduct in this case should make appellees liable under this theory of action, would "dramatically expand the boundaries of the tort [the Court of Appeals] first recognized in *Harris*[.]" *Batson*, 325 Md. at 735, 602 A.2d 1191. Especially given our holdings thus far, we discern no activity on the part of Aramark and Ms. Knouse that is "utterly intolerable in a civilized society." *Id.* at 737, 602 A.2d 1191. *See Bozman v. Bozman*, 146 Md.App. 183, 198–99, 806 A.2d 740 (2002), *rev'd on other grounds*, 376 Md. 461, 830 A.2d 450 (2003).[10]

We affirm the circuit court's entry of summary judgment on the Count alleging intentional infliction of emotional distress, the related punitive damages count and those allegations against Ms, Knouse based on this tort.

## E.

### *False Imprisonment*

"An action for false imprisonment arises when one unlawfully causes a depravation of another's liberty against his will [or] when one *knowingly* gives false information to a law enforcement officer which leads to another person's arrest." *Allen v. Bethlehem Steel Corp.*, 76 Md.App. 642, 649, 547 A.2d 1105 (emphasis in original; citations omitted), *cert denied*,

---

**10.** The Court of Appeals confined its holding in *Bozman* to the abrogation of the doctrine of interspousal immunity. In her learned opinion for this Court, Judge Barbera, certainly presaging the higher court's ruling on that question, also reviewed numerous cases outlining the parameters of "outrageous" conduct, concluding that "the conduct that underlies appellant's claim of malicious prosecution is not, in and of itself, indicative of the sort of outrageous conduct contemplated by the *Lusby* [*v. Lusby*, 283 Md. 334, 390 A.2d 77 (1978)] exception to interspousal immunity." *Bozman v. Bozman*, 146 Md.App. 183, 198, 806 A.2d 740 (2002), *rev'd on other grounds*, 376 Md. 461, 830 A.2d 450 (2003).

*Green and Vernon Green Associates v. Allen,* 314 Md. 458, 550 A.2d 1168 (1988). The elements of this tort are "1) the depravation of the liberty of another; 2) without consent; and 3) without legal justification." *Heron,* 361 Md. at 264, 761 A.2d 56 (citing *Manikhi v. MTA,* 360 Md. 333, 365, 758 A.2d 95 (2000)).

"The test of legal justification, in the context of false arrest and false imprisonment [for which causes of action the elements are the same], is ' "judged by the principles applicable to the law of arrest." ' " *Id.* (quoting *Montgomery Ward v. Wilson,* 339 Md. 701, 721, 664 A.2d 916 (1995)) (quoting *Ashton v. Brown,* 339 Md. 70, 120, 660 A.2d 447 (1995)). *See Green,* 125 Md.App. at 366–67, 725 A.2d 596.

Appellant's false imprisonment theory runs into difficulty at the outset with the first element, that of "depravation of liberty." She claims that the conduct of the investigation interview by Aramark security in that company's offices constituted an actionable deprivation of liberty. We disagree and explain.

Ms. Carter was taken to an Aramark office at the stadium and questioned about her alleged activities at issue here. She explained in her deposition that she "was told [that she had] to sit here and answer questions and I can't leave from this office until this person finishes with me." Ms. Carter was then asked "[w]hat stopped you from getting up and walking out the door when everyone else walked out?" She replied:

> Well, I was being questioned. I was obeying what was asked of me. So that is why, you know, I was told to sit here and wait until the next person finish with me, so that is why I stayed.
>
> Because I follow directions.
>
> I normally just do it.[11] And ask questions later.

---

11. At the time, Ms. Carter was employed full time as a supervisor at a VA Hospital. She is an Army veteran.

The Court of Appeals reminds us that "[a]ny exercise of force, or threat of force, by which in fact the [tort victim] is deprived of [her] liberty . . . is an imprisonment." *Manikhi,* ·360 Md. at 366, 758 A.2d 95 (quoting *Mason v. Wrightson,* 205 Md. 481, 487, 109 A.2d 128 (1954)) (quoting *Mahan v. Adam,* 144 Md. 355, 365, 124 A. 901 (1924)). There is no genuine issue of material fact with respect to a threat of force, or to the exercise of force in this case. We agree with the analysis of the Illinois Appellate Court in *Hanna v. Marshall Field & Co.,* 279 Ill.App.3d 784, 216 Ill.Dec. 283, 665 N.E.2d 343, 349 (1996), where the court, citing RESTATEMENT (SECOND) OF TORTS, § 892B, noted that "[v]oluntary consent to confinement nullifies a claim of false imprisonment[, and that] consent is not invalidated even if an employee is threatened with discharge." Although applying Illinois law, the intermediate appellate court also cited to *Johnson v. United Parcel Services, Inc.,* 722 F.Supp. 1282 (D.Md.1989), *aff'd,* 927 F.2d 596 (4th Cir.1991). Writing for the federal district court, Judge Smalkin stated:

> The remaining count, claiming false imprisonment, may be dealt with readily. It is undisputed that no physical force was applied to detain plaintiff during his interview on the evening of March 6. Not only was there no physical force used, but plaintiff could have walked out of the room and off the premises, without having to pass through any locked door or other physical barrier. Moreover, he does not allege any verbal threat of force or any conduct on the part of defendant's agents that restricted his means of escape, other than a statement leading plaintiff to fear that he might lose his job should he leave. The restraint that resulted simply from plaintiff's fear of losing his job is insufficient as a matter of law to make out a claim of false imprisonment. See, e.g., *Mason v. Wrightson,* 205 Md. 481, 487, 109 A.2d 128, 131 (1954). Even if statements of defendant's agents led plaintiff to believe that he would be fired immediately should he leave the room, this is an insufficient threat for supporting a claim for false imprisonment. *See, e.g.,* Restatement (2d) of Torts § 40A, comment

a, illustrations 1 and 2 (1965) (A threat by defendant, with gun in hand, to shoot plaintiff's child should plaintiff leave the room is sufficient, as is a threat to destroy plaintiff's valuable personal property on the spot.). *See also Lopez v. Winchell's Donut House*, 126 Ill.App.3d 46, 466 N.E.2d 1309, 1312, 81 Ill.Dec. 507 (1984) and *Sauls v. Bristol–Myers Co.*, 462 F.Supp. 887, 889 & n. 9 (S.D.N.Y.1978). *See generally Prosser & Keeton on The Law of Torts* 49–50 (5th ed. 1984). Thus, summary judgment is appropriate as to plaintiff's false imprisonment claim, Count II of the complaint.

722 F.Supp. at 1284–85. *See also, e.g., Marten v. Yellow Freight System, Inc.*, 993 F.Supp. 822, 829–30 (D.Kan. 1998).

The circuit court correctly entered summary judgment on the false imprisonment count and derivative counts for punitive damages and aiding and abetting.

## F.

### *Punitive Damages*

" '[T]he purposes of punitive damages relate entirely to the nature of the defendant's conduct.' " *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 454, 601 A.2d 633 (quoting *Schaefer v. Miller*, 322 Md. 297, 321, 587 A.2d 491 (1991)), *reh'g denied*, 325 Md. 665, 602 A.2d 1182 (1992). Judge Eldridge continued in *Owens–Illinois:*

> Awarding punitive damages based upon the heinous nature of the defendant's tortious conduct furthers the historical purposes of punitive damages—punishment and deterrence.... Thus, punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability.

*Id.*, 325 Md. at 454, 601 A.2d 633 (citations omitted).

Justice Stevens recently articulated the respective functions of compensatory and punitive damages:

Although compensatory damages and punitive damages are typically awarded at the same time by the same decision-maker, they serve distinct purposes. The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. *See* Restatement (Second) of Torts § 903, pp. 453–454 (1979); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 54, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (O'Connor, J., dissenting). The latter, which have been described as "quasi-criminal," *id.*, at 19, 111 S.Ct. 1032, operate as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence"); *Haslip*, 499 U.S., at 54, 111 S.Ct. 1032 (O'Connor, J., dissenting) ("[P]unitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible").

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

In Maryland, punitive damages lie in situations where the defendant's conduct is "characterized by knowing and deliberate wrongdoing." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 228, 652 A.2d 1117 (1995). The "clear and convincing" standard of proof applies to make out a claim for punitive damages. *Owens–Illinois*, 325 Md. at 469, 601 A.2d 633.

In this case, the circuit court, initially ruling from the bench, concluded:

The issue is, are there facts of a quality required to permit a jury to conclude that maliciously, recklessly the Defendant and/or its agents knew there was no such illegal activity

happening, they had no basis for believing it or they had reasons to conclude that it was not taking place but nevertheless went forward maliciously to ensnare Ms. Carter out of evil motive. The answer is no, there are no such facts.

▇ We will uphold the summary judgment on the punitive damages counts in view of our conclusions that no action for compensatory damages will lie in this case. In Maryland, there must be an underlying award for compensatory damages before an award of exemplary damages may be rendered. *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 773–74, 752 A.2d 200 (2000); *Caldor v. Bowden,* 330 Md. at 662, 625 A.2d 959. The circuit court's ruling is consistent with that judge's entry of summary judgment on the counts seeking compensatory damages. In view of our affirmance of those rulings, we have no occasion to explore in a vacuum the validity of appellants' punitive damages claims. We affirm the circuit court's disposition of the punitive damages allegations.

## G.

### *Aiding and Abetting*

Appellants sued Ms. Knouse in her individual capacity, asserting that she aided and abetted in the commission of all of the tortious actions by Aramark for which she brought this litigation. The circuit court entered judgment against appellants on this count, explaining that because summary judgment had been entered against them on the substantive counts brought against Aramark, no action for aiding and abetting would lie. He further implied that any acts taken by Ms. Knouse were within her role as an employee of Aramark.

Appellants contend that Ms. Knouse was crucial in initiating the ill-fated criminal prosecution; that she was a "funnel" for the inaccurate information which led to the injuries suffered by Ms. Carter. They strenuously question whether her actions in "informing the world of alleged employee infractions via criminal prosecution" were within her job description. Appellants insist that Ms. Knouse was more than a facilitator for the criminal prosecution, and was indeed a "cheerleader."

The short answer to appellants' argument is that our affirmance of the substantive counts works against them on the merits. *Alleco Inc. v. Harry & Jeanette Weinberg Foundation*, 340 Md. 176, 201, 665 A.2d 1038 (1995). *See Manikhi*, 360 Md. at 360 n. 6, 758 A.2d 95 (citing *Alleco* and noting complaint's "improper pleading to allege aiding and abetting . . . as if [it was a] cause[ ] of action independent of underlying tort.").

We therefore affirm the circuit court's disposition of this count. Overall, we affirm the circuit court's rulings in all respects.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**