**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-2026**

———————

WILLARDA V. EDWARDS, M.D.,

        Plaintiff – Appellant,

v.

AMERICAN MEDICAL ASSOCIATION, INC.,

        Defendant – Appellee.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell, III, Chief District Judge.  (1:22-cv-03297-GLR)

———————

Submitted:  November 21, 2024             Decided:  February 10, 2025

———————

Before AGEE, QUATTLEBAUM, and RUSHING, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ON BRIEF:**  Timothy F. Maloney, Alyse L. Prawde JOSEPH, GREENWALD & LAAKE, P.A., Greenbelt, Maryland, for Appellant.  Clifford J. Zatz, Rebecca Baden Chaney, Jillian Ambrose, CROWELL & MORING LLP, Washington, D.C., for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2022, Dr. Willarda V. Edwards was a candidate for the American Medical Association ("AMA") President-Elect position. Prior to the election, a member of the AMA's Board of Trustees allegedly defamed her by informing the AMA's delegates that she was accused of campaign violations. As a result, she brought multiple claims against the AMA, including defamation, false light invasion of privacy, and civil conspiracy. The district court dismissed her complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). Upon review, we agree with the district court that Dr. Edwards' claims fail as a matter of law.

I.

Dr. Edwards has served in various elected and appointed positions at medical associations, including the AMA Board of Trustees.[1] Throughout her career, she has also "been a national leader in addressing racial disparities in American health care." J.A. 17.

In June 2022, Dr. Edwards, an African-American woman, was the leading candidate of the AMA Southeastern Delegation (the "SED") for the national AMA President-Elect position. She was informed that Dr. William Reha, a candidate for the AMA vice-speakership from the SED, intended to withdraw his candidacy. Under one viewpoint, Dr.

---

[1] Because the district court dismissed Dr. Edwards' complaint for failure to state a claim under Rule 12(b)(6), we recount the facts as alleged in the complaint and assume their validity at this stage. *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 317 n.2 (4th Cir. 2017).

Reha's withdrawal could increase Dr. Edwards' opportunity to win the President-Elect position, so some colleagues suggested that she call Dr. Reha to thank him.

During the phone call, Dr. Reha informed Dr. Edwards that he was "putting [his] card down," meaning that, contrary to what she had heard, Dr. Reha *did* still intend to run for the vice-speakership position. J.A. 10. Dr. Reha asked Dr. Edwards how his decision affected her candidacy. Unbeknownst to Dr. Edwards, Dr. Reha allegedly recorded their phone call, but the contents of that call are otherwise unknown.

The next day, Dr. Edwards arrived at the AMA annual meeting in Illinois. After Dr. Edwards completed interviews related to her candidacy, AMA Vice-Speaker Dr. Lisa Egbert asked Dr. Edwards to come with her. Dr. Egbert brought Dr. Edwards to meet with the AMA Election Campaign Committee (the "Committee").[2]

In that meeting, the Committee accused Dr. Edwards of "vote trading" and questioned her about the alleged "vote trading activity." J.A. 12. Later, the Committee informed the Southeast Region that a "formal complaint" had been filed and that the Committee had conducted "multiple interviews" about its allegations. J.A. 12. The Committee did not provide Dr. Edwards with any evidence, information about the interviews, or a copy of the complaint.

A few days later, Dr. Bruce Scott, the Speaker of the AMA House of Delegates (the "House"), spoke at the AMA's Monday Business Session. During that speech, he informed

---

[2] The complaint references an "Election Committee" and an "Election Campaign Committee." Based on the complaint, it appears that these are the same entities. Consequently, throughout this opinion, that entity will be referred to as the "Committee."

the delegates that the Committee had received a complaint against Dr. Edwards alleging a potential campaign violation. He further stated that Committee members had interviewed multiple individuals said to have knowledge of the circumstances and "reviewed evidence that was deemed credible and corroborated that a campaign violation" occurred. J.A. 14. He explained that, based on the information gathered, the SED and another delegation arranged a "quid pro quo" where the other delegation "would support Dr. Edwards' current candidacy, and [SED] would support a future candidate from the other delegation." J.A. 14. Finally, he stated that she took "advantage of this arrangement," and that "the House— you—are the final arbiter with your votes."[3] J.A. 14. Dr. Edwards then spoke before the House and denied any wrongdoing.

After the Monday Business Session, MedPage Today published an article online about Dr. Scott's speech, which included his purportedly defamatory statements.

The next day, Dr. Scott repeated the allegations regarding Dr. Edwards' campaign violations "to more than 600 delegates just minutes prior to the casting of votes." J.A. 15. He also stated that "the findings of the Election Committee still stand," "rumors that [it] had reversed its decision were incorrect," and "Dr. Edwards was guilty of vote trading." J.A. 15. Before Dr. Edwards could respond to these allegations, the delegates voted for the President-Elect position.

Despite Dr. Scott's defamatory statements, Dr. Edwards advanced to the run-offs in the election, but ultimately lost the race. The SED requested information from the

---

[3] Dr. Edwards alleged that the AMA's governing documents do not, in fact, provide that the AMA House of Delegate is the final arbiter of violations of campaign rules.

Committee about the allegations against her. In response, the Committee stated that "the sanction for the violation was the announcement to the House." J.A. 16. The SED thereafter reported to its membership that "the whole affair lacked any reasonable semblance of due process: neither the charges nor any of the evidence was ever presented for rebuttal as well as any ability for her, or us, to face the accusers." J.A. 16.

In retrospect, it became "obvious that the only so-called 'evidence' against Dr. Edwards was Dr. Reha's surreptitiously recorded telephone call." J.A. 13. In her view, "structural racism" caused the Committee to sabotage her campaign, evidenced by the fact that the AMA "has never treated a candidate who was not a person of color in this fashion." J.A. 17.

The district court granted the AMA's motion to dismiss Dr. Edwards' complaint for failure to state claim. It found that the common interest privilege shielded the AMA's statements from defamation and false light liability, and that her allegations failed to overcome that privilege by making the required showing that the statements were made with actual malice. Thus, based on the absence of an underlying tort, the district court also dismissed her civil conspiracy claim.

Dr. Edwards timely appealed, J.A. 37, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

We review de novo a district court's grant of a motion to dismiss. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). To survive a motion to dismiss for failure to state a claim,

5

"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Notably, "[a] defamation complaint, like any other civil complaint in federal court," must meet federal pleading standards. *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005). Thus, "the usual standards of notice pleading apply in defamation cases," *id.*, meaning that although "there is no heightened pleading standard for malice, [it] must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated," *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (emphasis omitted).

## III.

Dr. Edwards first contends that the common interest privilege is inapplicable. But even if it applies, she argues that her allegations in the complaint are sufficient to show actual malice that overcomes the privilege. On both counts, we disagree.

We must first address which state's substantive law to apply. *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016) ("Under the familiar *Erie* doctrine, we apply state substantive law and federal procedural law when reviewing state-law claims."). Before the district court, the parties cited both Maryland and Illinois law in their arguments regarding dismissal of the claims, but Dr. Edwards also contended that Illinois law applied

6

based on choice-of-law principles. Nonetheless, the district court opted to "utilize law from both jurisdictions," just as the parties did in their briefs. J.A. 30. And on appeal, Dr. Edwards failed to raise a choice-of-law argument until her Reply Brief, which is insufficient to preserve the argument for our review. *Grayson O. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Thus, we will take the same approach as the district court and evaluate Dr. Edwards' claims under Maryland and Illinois law.

Ultimately, the issue of which state's law applies is inconsequential because, under either state's law, her claim fails. Both states recognize that certain qualified privileges "shield a person's statements from liability for defamation." *Lindenmuth v. McCreer*, 165 A.3d 544, 555 (Md. Ct. Spec. App. 2017); *see Dent v. Constellation NewEnergy, Inc.*, 202 N.E.3d 248, 256 (Ill. 2022). And as relevant here, they both acknowledge a "common interest privilege" where the publisher shares an interest with the individuals to whom the defamatory matter is published.[4] *See Gohari v. Darvish*, 767 A.2d 321, 329 (Md. 2001) (finding a qualified privilege "among members of identifiable groups [who] share similar goals or values," such as "interests in . . . professional dealings") (cleaned up); *Dent*, 202 N.E.3d at 257 (explaining that a qualified privilege arises where an "interest of the person to whom the matter is published or of some other third person is involved") (quoting *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 135 (Ill. 1993)). That privilege

---

[4] Illinois does not refer to this privilege as the "common interest privilege" in its case law. Nonetheless, it recognizes a privilege where parties share a common interest, and thus for clarity, we use the same term throughout this opinion. *See Dent*, 202 N.E.3d at 257.

extends not only to defamation claims, but also to claims of false light invasion of privacy. *Lindenmuth*, 165 A.3d at 558.

Under both Maryland and Illinois law, the defendant bears the initial burden of establishing that an allegedly defamatory statement was privileged, which is a question of law. *Gohari*, 767 A.2d at 338; *Kuwik*, 619 N.E.2d at 133–34. Upon a showing that a statement was privileged, the burden shifts and "the plaintiff must produce facts, admissible in evidence, demonstrating the defendant abused the privilege," i.e., "that the defendant made his or her statements with malice." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1148 (Md. 2012); *see Kuwik*, 619 N.E.2d at 133.

Although ultimately a distinction without a difference for our purposes, it is worth noting that Maryland and Illinois diverge slightly in their definitions of malice. In Maryland, malice is "a person's actual knowledge that his [or her] statement is false, coupled with his [or her] intent to deceive another by means of that statement," *Piscatelli*, 35 A.3d at 1148 (alterations in original), which is not satisfied by a reckless disregard for the truth, *Seley-Radtke v. Hosmane*, 149 A.3d 573, 589 (Md. 2016) (explaining that the standard for malice adopted in *Piscatelli* does not encompass a reckless disregard for the truth). Illinois, by contrast, employs a broader definition, defining malice as not only a person's actual knowledge of falsity, but also their "reckless disregard of [the defamed party's] rights and of the consequences that may result to him." *Kuwik*, 619 N.E.2d at 135 (alteration in original). So while actual knowledge of falsity constitutes malice in both states, a lower standard—reckless disregard for the truth—is also sufficient to overcome a qualified privilege in Illinois.

8

With these principles in mind, we turn now to consider the initial question of whether the AMA established a common interest qualified privilege under Maryland and Illinois law. We find that it has.

Dr. Edwards alleged that Dr. Scott, a member of the Committee, shared the defamatory statements with delegates prior to the election. And under Maryland law, Dr. Scott and the AMA's delegates had a common interest as members of an "identifiable group[]" that shared an interest in "professional dealings." *Gohari*, 767 A.2d at 329. Similarly, under Illinois law, the election was an occasion "where a misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information," meaning that Dr. Scott's statements are entitled to a qualified privilege. *Stavros v. Marrese*, 753 N.E.2d 1013, 1018–19 (Ill. App. 2001) (applying a qualified privilege because officials "have an interest in knowing whether [] employees are performing their official duties in a professional manner"). At bottom, the defamatory statements concerned "one of the candidates for presidency of the national organization allegedly engag[ing] in improper vote trading through an alleged quid pro quo." J.A. 33. The AMA's delegates plainly have an interest in that information. Therefore, the privilege applies under both states' laws.

Dr. Edwards resists this conclusion, contending that media presence during Dr. Scott's statements constituted excessive publication and foreclosed application of the privilege. But as the AMA points out, she waived this argument by failing to raise it before the district court. *See In re Under Seal*, 749 F.3d 276, 287 (4th Cir. 2014) ("If a party wishes to preserve an argument for appeal, the party must press and not merely intimate

9

the argument during the proceedings before the district court." (cleaned up)). And even if it was not waived, the argument fails. Her lone allegation regarding the media's presence states: "MedPage Today published online detailed reporting about Dr. Scott's conduct. . . . That article included the false and defamatory statements that [he] [] made to the House." J.A. 14. However, she fails to allege that Dr. Scott actually made the allegedly defamatory statements to the media, as nothing in the complaint suggests that members of the media were actually present for his statements, or if they were, that he knew of that presence. *See* Restatement of Torts (First) § 604 (Am. L. Inst. 1938) (explaining that excessive publication occurs when an individual "knowingly publishes [defamatory] matter to a person to whom its publication is not otherwise privileged"). And viewing her allegations through the lens of *Iqbal*, 556 U.S. at 678, it is not reasonable to infer from the complaint as pleaded that the media was present, particularly in light of Dr. Edwards' allegations that Dr. Scott made the statements to "the delegates," J.A. 14–15.

Because the common interest privilege applies, the next inquiry is whether Dr. Edwards' allegations of malice overcome that privilege. As an initial matter, Dr. Edwards contends that the district court erred in dismissing her claims at this stage because whether the AMA acted with actual malice is a question for the fact-finder. But as discussed above, "the usual standards of notice pleading apply in defamation cases," and so a plaintiff must articulate "a 'plausible' claim for relief" in accordance with Federal Rule of Civil Procedure 8. *Mayfield*, 674 F.3d at 377. And both Maryland and Illinois have recognized that, under their respective pleading standards, the issue of whether a plaintiff has alleged actual malice sufficient to overcome a qualified privilege can be decided as matter of law.

10

*See Piscatelli*, 35 A.3d at 1148 ("While malice is usually a question for the fact-finder, it need not be submitted to the fact-finder when the plaintiff fails to allege or prove facts that would support a finding of malice."); *Dent*, 202 N.E.3d at 258–59 (reversing the finding that allegations were sufficient to withstand a motion to dismiss where "there [was] no set of [the alleged] facts which would show an abuse of the qualified privilege," i.e., actual malice). Accordingly, we ask whether Dr. Edwards has alleged facts that, if accepted as true, plausibly show actual malice under Maryland or Illinois law.

Upon review of Dr. Edwards' allegations of malice—i.e., an actual knowledge of falsity or a reckless disregard for the truth—we find that they do not overcome the privilege. On this point, *Mayfield* is instructive. There, we found that the Appellants did not plausibly allege actual malice where they alleged that statements regarding Mayfield's positive drug tests "were known by [Appellees] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity." 674 F.3d at 377–78. We held that "[t]his kind of conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Id.* at 378. Nor were we persuaded that the remaining allegations stated a claim; namely, that "Appellees intended to harm Mayfield by publishing his drug test results," that they "failed to follow [] testing procedures," and "that [they] were informed by Mayfield that he took both Claritin and Adderall." *Id.* Instead, we noted that Appellants admitted that Appellees "contacted Mayfield to follow up on the issue, ask[ed] him what drugs he had taken as part of their investigation," and "was randomly selected to undergo drug testing pursuant to a

11

valid NASCAR policy and two separate tests yielded a positive result for methamphetamine," which cut against a finding of malice. *Id.* (emphases omitted).

Our reasoning in *Mayfield* maps precisely onto the facts here. In conclusory fashion, Dr. Edwards alleges that the "AMA made the statements with actual malice," it "acted with, and was motivated by, the knowledge that these statements were false and with the intent to cause harm to Dr. Edwards," and it "reckless[ly] disregard[ed] [] the truth or falsity of these statements."[5] J.A. 19. But "a mere recitation of the legal standard" is insufficient to satisfy our pleading standard. *Mayfield*, 674 F.3d at 378. To support her conclusion, she alleges that the evidence referenced by Dr. Scott and reviewed by the Committee "was not credible, . . . there was no 'quid pro quo' that had been arranged, . . . and [she] did not act to take advantage of any such alleged arrangement." J.A. 18. But even accepting that the evidence was not credible, she fails to allege that Dr. Scott himself had any reason to believe—let alone actually know—that it was not credible at the time of his statements. Consequently, her allegations do not reasonably permit the inference that the statements were made with actual malice under Maryland law, i.e., that they were "the product of [Dr. Scott's] imagination" or "so inherently improbable that only a reckless person would have put [them] in circulation." *Cap.-Gazette Newspapers, Inc. v. Stack*, 445 A.2d 1038, 1044

---

[5] To be clear, we addressed a different issue in *Mayfield*: whether the plaintiff, as a public figure, adequately alleged actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254 (1993). 674 F.3d at 377. Yet, regardless of whether the definitions of malice are the same, *Mayfield* is instructive in evaluating, as a federal procedural matter, whether Dr. Edwards has adequately pleaded actual malice sufficient to overcome a qualified privilege. And the answer to that question is, of course, informed by the state substantive law underlying Edwards' defamation claim. *See Kerr*, 824 F.3d at 74.

12

(Md. 1982). They similarly fail under Illinois' lower standard of recklessness, as they do not suggest that he published his statements with "a high degree of awareness of its probable falsity or that [he] had serious doubts as to its truth." *Coghlan v. Beck*, 984 N.E.2d 132, 150 (Ill. 2013). Thus, since Dr. Edwards has not alleged facts that, if accepted as true, show actual malice under Illinois or Mayland law, she has failed to plausibly plead a claim.

In the alternative, Dr. Edwards contends that her allegations regarding the inadequacy of the AMA's investigation are evidence of actual malice. Again, we find her argument does not carry the day. She alleges that the Committee is a "star chamber" with "no semblance of transparency, due process, or basic fairness," and that she "had no opportunity to rebut the 'evidence' against her." J.A. 12–13. But actual malice in both states cannot be established "merely by showing . . . [that] the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person." *Cap.-Gazette Newspapers, Inc.*, 445 A.2d at 1044; *cf. Dent*, 202 N.E.3d at 258. And even taking Dr. Edwards' allegations as true, Dr. Scott stated that the Committee conducted multiple interviews, gathered credible evidence, and corroborated that a violation occurred. *Cf. Dent*, 202 N.E.3d at 260 (finding that Dent failed to allege actual malice to overcome a qualified privilege where he "did not allege any facts showing that respondents failed to investigate the truth of the matter, for example, by interviewing other guests"). She does not allege that the Committee did not, in fact, take those actions. Instead, she simply alleges that the evidence was not credible. But that is not the same as plausibly alleging that the Committee altogether failed to conduct a reasonable investigation. Thus, as a matter of law,

13

Dr. Edwards has failed to carry her burden of overcoming the AMA's qualified privilege based on actual malice.

Based on that conclusion, we can also dispense with Dr. Edwards' false light invasion of privacy claim. False light claims must meet the same legal standards as defamation claims, including that a statement is made with actual malice. Our finding that the AMA did not defame Dr. Edwards therefore "render[s] superfluous a separate analysis of [her] false light claim." *Piscatelli*, 35 A.3d at 1147; *see Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 209–10 (Ill. 1992) (requiring that, to prove a false light claim, a plaintiff must allege "that the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether [they] were true or false").[6]

Accordingly, we affirm the district court's dismissal of Dr. Edwards' defamation and false light claims.

IV.

Dr. Edwards next contends that, because the district court erred in dismissing her defamation and false light claims, it necessarily erred in dismissing her civil conspiracy claim based on her failure to allege an underlying tort. Again, we disagree.

---

[6] In the alternative, the AMA contends that Dr. Edwards is a limited-purpose public figure and thus must meet the standard of actual malice articulated in *Sullivan*. Because the district court did not reach this issue and we find that Dr. Edwards' claims fail under Maryland and Illinois law, we decline the AMA's invitation to address this issue in the first instance on appeal.

14

Civil conspiracy is the "combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005)); *see McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 253 (Ill. 1999) (defining civil conspiracy as "a combination of two or more persons [by an agreement] for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means"). Neither Maryland nor Illinois recognizes a standalone civil conspiracy claim; such a claim requires an underlying tort be committed in furtherance of the agreement. *Marshall*, 758 F.3d at 541; *McClure*, 720 N.E.2d at 258.

As discussed above, we affirm the district court's dismissal of Dr. Edwards' defamation and false light claims. Consequently, she has failed to allege an underlying tort that was committed in furtherance of the civil conspiracy. The absence of such a tort is fatal to her civil conspiracy claim. *See Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 465–66 (Ill. 2024) (affirming dismissal of a civil conspiracy claim because "the plaintiff [] failed to state an independent cause of action"); *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1047 (Md. 1995) (same). We thus affirm the district court's dismissal of Dr. Edwards' civil conspiracy claim.

15

V.

For the reasons discussed, we affirm the district court's dismissal of Dr. Edwards'

defamation, false light invasion of privacy, and civil conspiracy claims.

*AFFIRMED*